Joseph A. HORVATH, Plaintiff,

v.

SAVAGE MANUFACTURING, INC.,
and Mack Trucks of Utah, Inc.,
Defendants.

Civil No. 2:96–C–0912B.

United States District Court,
D. Utah,
Central Division.

Sept. 3, 1998.

Donald Winters, Pleasant Grove, UT, for Plaintiff.

Jathan Janove, Salt Lake City, UT, for Defendants.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### I. INTRODUCTION

This matter is before the court on defendants' motion for summary judgment. Plaintiff brought suit against the defendants alleging disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, religious discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and common law gross negligence. On March 20, 1998 a hearing was held on defendants' motion. Donald W. Winters represented Plaintiff. Jathan W. Janove represented Defendants. After the court heard argument, the court requested additional briefing on the issue whether asthma may be considered a disability under the ADA. The court now enters this memorandum opinion and order.

### II. BACKGROUND FACTS

Defendant Mack Trucks ("Mack") hired plaintiff Joseph Horvath ("Horvath") in June, 1993 as a painter. In his application, Horvath indicated that he had asthma. Kaylen Ash, a Mack vice-president, asked Horvath in an interview whether Horvath's asthmatic condition would be a problem and Horvath described his condition as an "allergic response" that was easily controlled with medication. Mack hired Horvath for an initial thirty day probationary period. Sometime during the probationary period, Horvath told Mack that he needed fresh air supplied in the painting area.

After the probationary period, Mack requested that Horvath have a physical examination before it hired him permanently. Horvath underwent a physical examination which confirmed he had asthma, but the exam did not conclude the asthma was debilitating. Based on Horvath's satisfactory completion of the probation requirements, Mack hired Horvath permanently.

Mack was required by OSHA regulations to keep a fresh air pump working in the paint room, but Mack's pump did not run properly. On several occasions during Horvath's proba-

tionary period and after he was hired permanently, Horvath complained that supplied air was not available to him. Despite these complaints, Mack did not replace the pump during Horvath's tenure. Although Horvath complained, he never stated that he could not do his job without the fresh air pump nor did he specifically inform Mack that the lack of fresh air was harder on him because of his asthma.

Mack conducted a yearly pulmonary function test on its employees and in July, 1994, Horvath's test showed a decline in his lung capacity. Based on this information, Horvath went to a pulmonary specialist who concluded in October, 1994 that Horvath could paint "using a respirator," but then changed his mind and decided that Horvath could not paint under any conditions. In November, 1994, Horvath informed Mack of his doctor's recommendation and Horvath told Mack that he could not longer paint or work in the paint shop. Mack asked for confirmation and Horvath's physician sent a written explanation of Horvath's condition to Mack on December 18, 1994. Horvath requested an office position, but Mack did not have an office vacancy at that time. Horvath thus terminated his employment with Mack.

During Horvath's employment with Mack, Kaylen Ash ("Ash") became aware that Horvath was Catholic. Horvath alleges that Ash treated him differently than he treated members of The Church of Jesus Christ of Latter Day Saints ("Mormons"). Specifically, Horvath remembers Ash saying that he paid Mormons ten percent more because they paid ten percent of their income to their church. Horvath also alleges that he was denied overtime work, wage increases, and job promotions based on his religious affiliation.

In October, 1994, Horvath's son, Brian Horvath, filed a religious discrimination charge against Mack with the Utah Anti-Discrimination Division ("UADD"). The UADD investigated the son's complaint and interviewed Horvath at work as part of its investigation. Mack paid Horvath for the time spent in the interview.

A few hours after Horvath completed the interview with the UADD, Mack informed Horvath that James Farley would be assuming the job of lead painter and would have supervisory duties over him. Horvath felt this was a demotion because he believed he had lead painter supervisory duties, although he did not have an official title. Mack had offered the lead job to Farley earlier, but Farley had declined to take the job at that time. Horvath continued as a painter in the department until his termination in December, 1994.

Horvath brought suit against Mack on October 25, 1996, alleging that Mack had violated the Americans with Disabilities Act, 42 U.S.C. § 12100, by failing to accommodate his disability of asthma by not providing a proper breathing apparatus in the workplace. Horvath also alleged that Mack acted with gross negligence by failing to provide supplied air. Finally, Horvath alleged that Mack discriminated against him based on religion in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, by treating employees of other faiths differently and demoting him after he interviewed with the UADD in conjunction with his son's religious discrimination complaint. Mack moved for summary judgment on all claims.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to establish the existence of an essential element to the claims on which they bear the burden of proof at trial. *Id.* To satisfy this burden, the non-moving party cannot rest on the pleadings, but must by affidavit or other appropriate means, set forth specific facts showing

there is a genuine issue for trial. Fed. R.Civ.P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's case is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court must construe all facts and reasonable inferences therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. The Americans with Disabilities Act Claim

Horvath claims that Mack violated the ADA when it did not accommodate his disability of asthma by failing to supply fresh air in the paint chamber. Mack moved for summary judgment on the ADA claim, arguing that Horvath's asthma did not qualify as a disability under the ADA and that even if Horvath's asthma could be considered a disability, it could not accommodate Horvath because it did not have notice of his disability until after Horvath terminated his employment.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The regulations implementing the ADA further state that "it is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability...." 29 C.F.R. § 1630.9 (1997). It is undisputed that Mack did not accommodate Horvath's request for supplied air. Thus, in order to determine whether Mack violated the ADA, this court must decide whether

Horvath was a qualified employee with a disability.

The ADA regulations define disability as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual." 29 C.F.R. § 1630.2(g) (1997). Mack contends that Horvath's asthma was not a disability because it did not substantially impair a major life activity.

■ The first step in the inquiry to determine whether Horvath's asthma was a disability is to decide whether it was a physical or mental impairment. The ADA regulations define physical or mental impairment as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, ... respiratory (including speech organs)...." 29 C.F.R. § 1630.2(h) (1997). Asthma is a physiological disorder that affects the respiratory system,[1] therefore it qualifies as a physical impairment. *Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994).

The definition of disability is not satisfied unless the impairment affects a major life activity. Horvath claims that his asthma affects his major life activities of breathing and working. Under the regulations implementing the ADA, the ability to breathe and work are major life activities. 29 C.F.R. § 1630.2(i) (1997).

The final element of the disability definition is whether Horvath's physical impairment was a substantial limitation on the major life activities he has claimed. The ADA regulations specify three factors relevant in considering whether the impairment is one that substantially limits a major life activity: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from

---

1. " 'Asthma is a condition of the lungs in which there is widespread narrowing of airways, varying over short periods of time either spontaneously or as a result of treatment, due in varying degrees to contraction (spasm) of smooth muscle, edema of the mucosa, and mucus in the lumen of the bronchi and bronchioles; these changes are caused by the local release of spasmogens and vasoactive substances (e.g. histamine, or certain leukotrienes or prostaglandins) in course of an allergic process.' " *Gaddy v. Four B Corp.*, 953 F.Supp. 331, 332 n. 1 (D.Kan.1997) (quoting Stedmans' Medical Dictionary 158 (26th ed.1995)).

the impairment." 29 C.F.R. § 1630.2(j)(2) (1997); *see also, Bolton v. Scrivner*, 36 F.3d 939, 943 (10th Cir.1994). Also, the court may take into consideration "mitigating or corrective measures utilized by the individual." *Sutton v. United Air Lines*, 130 F.3d 893, 902 (10th Cir.1997) (taking into consideration plaintiff's use of corrective lenses for the alleged disability of impaired vision). *See also, Gaddy v. Four B Corp.*, 953 F.Supp. 331, 337 (D.Kan.1997) ("If an insulin-dependent diabetic can control her condition with the use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are 'substantially limited' in major life activities.") Horvath alleges substantial impairment of the two activities of breathing and working. The court will analyze each activity separately.

### 1. Substantial Impairment of Breathing

Horvath argues that "asthma is a disability within the ADA" but does not explicitly argue that this condition limited his breathing. Horvath recognizes that "the disability determination does not depend as much on the name or diagnosis of the impairment as it does on the effect the impairment has on a particular individual." *Dotson v. Electro-Wire Products, Inc.*, 890 F.Supp. 982, 987 (D.Kan.1995). *See also*, 29 C.F.R.App. § 1630(j) (1997) (noting that finding of a disability "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others, depending upon the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.") This court agrees that regardless of the name of plaintiff's medical condition, plaintiff must show that the condition substantially impaired him. *See, Mobley v. Bd. of Regents*, 924 F.Supp. 1179, 1187 & n. 13 (S.D.Ga.1996) ("Plaintiff instead relies on the conclusory statement that it is 'obvious' that an asthmatic condition impacts an individual's ability to breathe ... Certainly, this Court recognizes that asthmatic conditions can affect people in many different ways. However, if is far from 'obvious' that the Plaintiff's asthmatic condition affects her in a manner such that it constitutes a disability under the ADA.")

This court is not aware of any U.S. Supreme Court or Tenth Circuit Court of Appeals opinion that provides guidance on the issue whether an asthmatic condition similar to the one at issue here constitutes a disability under the ADA. The courts that have considered whether asthma substantially impaired a plaintiff's breathing have reached different conclusions without a great deal of legal analysis. The facts of course vary from case to case and the factual circumstances are critical in making the ultimate determination whether a given asthmatic condition constitutes a *substantial* impairment. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir.1998) (noting that district court found plaintiff's breathing substantially limited when plaintiff's asthma was "exquisitely sensitive ... to environmental changes and irritations" and her doctor recommended that her occupational environment be "neither hot nor extremely cold and 'free of allergens as is reasonably possible.'"); *Davidson v. Perry*, 1998 WL 10377 at *1 (4th Cir.1998) (noting that district court found plaintiff disabled with asthma); *Ventura v. City of Independence*, 1997 WL 94688 at *2 (6th Cir.1997) (holding plaintiff's asthma did not substantially impair him because he admitted that he could play sports, exercise, walk, run, play the saxophone, and engage in numerous other types of employment); *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994) (finding plaintiff's breathing was not substantially impaired because plaintiff testified she could exercise and swim outside of the work environment that created her breathing trouble); *Byrne v. Bd. of Educ.*, 979 F.2d 560, 566 (7th Cir.1992) (finding issue of fact when plaintiff presented sufficient evidence of impairment to give issue to jury when she showed that she could not work in two schools because of exposure

to fungus but was capable of teaching elsewhere or doing other kinds of work); *Mobley v. Bd. of Regents,* 924 F.Supp. 1179, 1187 (S.D.Ga.1996) (finding plaintiff's breathing was not substantially impaired when "plaintiff has submitted no evidence that her condition substantially limits or even remotely affects her ability to breathe outside [plaintiff's building] environment."); *Suttles v. United States Postal Service,* 927 F.Supp. 990, 1004 (S.D.Tex.1996) (finding plaintiff not disabled under the Rehabilitation Act when plaintiff could function normally as long as he took his medication and avoided extended exposure to dust allergens, fumes, and smoke); *Homeyer v. Stanley Tulchin Assoc.,* 1995 WL 683614 at *3 (N.D.Ill.1995) (finding plaintiff's breathing was not substantially impaired when she could work as a typist in environments that did not contain tobacco smoke).

Taking some general guidance from these cases, the court will now in turn examine each of the three factors mandated by the ADA regulations: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2) (1997).

a. Nature and Severity of the Impairment

The first factor the court considers is the nature and severity of the impairment. It is undisputed that the nature and severity of Horvath's asthma was not significant at the time he started work and throughout his probationary period. Horvath testified that he used his inhaler two to three times a day when he started working at Mack and that his asthma "wasn't serious" and did not limit him severely. The duration of the effect of Horvath's asthma was not significant based on his use of medication. He described the medication he was on as "the bottom level, you know, the minimal short-acting type stuff." Deposition of Joseph A. Horvath ("Horvath Depo.") at 20:12–19. By his own admission, Horvath's major life activity of breathing was not substantially limited by his asthmatic condition prior to his employment at Mack. Plaintiff's Brief Pursuant to Defendant's Motion for Summary Judgment at 4. Thus when Horvath requested supplied air at the beginning of his employment, he did not have a disability that Mack was required under the ADA to reasonably accommodate.

During his employment at Mack, Horvath's asthma became substantially worse and Horvath claims his asthma progressed to the point of disability. Defendant argues that because Horvath's disability, if any, was caused by his employment at Mack, Worker's Compensation provides the appropriate and exclusive remedy. However, if Horvath's condition progressed to the point of disability and his employment caused the injury, both the ADA and Worker's Compensation statutes may be triggered. *See, Oleson v. KMart Corp.,* 1996 WL 772604 at *5 (D.Kan.1996) (noting that plaintiff's receipt of workers' compensation benefits did not automatically preclude him from recovering under the ADA). It would seem from the plain language of the ADA that whenever an employee has a "disability," no matter the cause, the employer is obligated to reasonably accommodate the disability.

The nature and severity of Horvath's asthma during his employment is difficult to determine. In July, 1994, Horvath completed a routine physical required by Mack which disclosed that Horvath had decreased lung capacity. Declaration of Jeffrey Burtaine at 3. Mack's doctor sent Horvath to a pulmonary specialist to determine if Horvath should be working around paint. Horvath went to see Dr. Douglas Ross in August, 1994. In Dr. Ross's report, he concluded that Horvath "has all the classic symptoms to a severe extent of obstructive sleep apnea, and he is an obese man with a body habitus consistent with obstructive sleep apnea." Dr. Ross further concluded that "It is difficult to tell how severe his asthma is with the underlying problems of probable obstructive sleep apnea ... I am not sure his asthma is worse, and I am not sure it is exacerbated in the workplace." Exhibit B, Defendant's Post–Hearing Memorandum in Support of Motion for Summary Judgment. Dr. Ross wrote a letter on October 7, 1994 indicating that Horvath could work using a respirator. Subsequently, on December 18, 1994, Dr. Ross wrote a letter diagnosing Horvath with "occupational asthma" and concluding that "[i]f

he continues to work in his present situation, his asthma will worsen." Exhibit C, Defendant's Post–Hearing Memorandum in Support of Motion for Summary Judgment.

Horvath has also testified regarding the severity of his condition. He claims that his breathing has been substantially limited because he cannot be around paint any more, he is not allowed to lift or do repetitive motions, he cannot walk long distances, he requires an oxygen supply, he must be allowed to nap at any time, and his use of an inhaler dramatically increased from two to three times a day to twenty to thirty times a day.

In contrast to Horvath's testimony, the defendant offers the affidavits of Horvath's most recent employer and supervisor. Gary L. Groves, Sr. and Gary L. Groves, Jr. both testify that Horvath worked for Precision Autobody and Paint from February, 1998 until July, 1998 and that they saw him perform physically demanding labor including lifting, pulling, bending, twisting, moving heavy equipment and swinging a large sledgehammer against metal. Gary L. Groves, Jr. also testifies that he observed Horvath painting and priming automobiles for customers. Horvath never indicated to either of the Groves that he had any physical limitations. Horvath contests the affidavits of the Groves and argues that he never painted or primed automobiles and that he had other employees help him with any strenuous task.

The nature and severity of Horvath's asthma is thus in dispute. The real question is whether the plaintiff has presented enough evidence from which a reasonable fact-finder could conclude that the severity of his asthma constituted a substantial impairment. Horvath's case with respect to this factor rests essentially on two pieces of evidence: 1) Dr. Ross's diagnosis and prognosis in November, 1994, and 2) Horvath's description of his asthma as significantly limiting him in his breathing.

### b. Duration of the Impairment

The second factor the court considers is the duration or the expected duration of the impairment. Horvath has not presented much evidence that shows that his occupa-

tional asthma has or will persist outside of the Mack workplace. Horvath has stated that asthma precludes him from certain activities, but has not indicated the expected duration of these effects. The evidence which has been presented largely shows that the impairment has not persisted at the degree present when Horvath left Mack. The affidavits of the Groves show that Horvath is capable of performing physically demanding labor and even painting. Horvath disputes the statements of the Groves. However, in his own deposition, Horvath testified that being removed from the Mack workplace made "a big difference." Horvath Depo. at 116.

### c. Permanent or Long Term Impact of the Impairment

The last factor is the permanent or long term impact resulting from the impairment. Horvath stated in his deposition that he could never paint again and that he could no longer perform heavy lifting or physically demanding labor. Horvath's testimony is the only evidence supporting this assertion. Again, the Groves' affidavits demonstrate that Horvath has recently performed physically demanding labor and painted automobiles although Horvath claims he has not performed such tasks. Horvath has not provided any doctor's reports that state the long term impact expected from his occupational asthma. The strongest statement from a physician concludes only that Horvath's asthma "will continue to worsen" if he persisted in painting at Mack. Horvath's doctor does not state that Horvath faces long term impairment based on his asthma or that Horvath's occupational asthma is permanent.

Taking all of Horvath's assertions about his physical condition as true together with Dr. Ross's statements, this court concludes that Horvath has presented a genuine issue of material disputed fact whether his asthma substantially impaired his breathing.

Mack argues that even if all of Horvath's assertions are true, Horvath has not presented enough evidence from which a reasonable fact-finder could conclude his asthma substantially limited his breathing. This court finds that although Horvath has not present-

ed a great deal of evidence supporting his claim, his own testimony and that of his physician present enough facts under each of the three factors for a jury to resolve the factual disputes and determine whether his asthma substantially impaired his breathing and rose to the level of a disability.

### 2. Substantial Impairment of Working

The second activity Horvath claims to have been substantially limited is working. In addition to the three factors of nature and severity, duration, and long term impact, with respect to the activity of working the regulations implementing the ADA provide that: "The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (1997). The regulations specify that "[t]he inability to perform a single particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

In determining whether an individual is significantly restricted in the ability to perform a class or broad range of jobs, the court must consider three factors:

[1] The geographical area to which the individual has reasonable access; [2] The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class or jobs); and [3] The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii)(A)–(C) (1997). The Tenth Circuit has also stated that while working is considered a major life activity under the ADA, "this does not necessarily mean working at the job of one's choice."

*Welsh v. City of Tulsa, Okl.,* 977 F.2d 1415, 1417 (10th Cir.1992).

■ Horvath complains that he has been substantially impaired in the major life activity of working because he can no longer paint, perform heavy labor, and must be allowed to take naps and have supplied air at all times. Horvath has not offered any evidence of his vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which Horvath would also be disqualified. The most Horvath has offered is that he is disqualified from working as an automobile painter. There is no evidence that Horvath is also disqualified from *all* types of painting or that he is disqualified from other types of jobs, in fact, Horvath's request to obtain an office job at Mack shows that Horvath believes he is qualified for work other than painting. Horvath has failed to show any evidence that his asthma substantially impairs his ability to work as defined under the ADA regulations. It is true that Horvath's asthma may impair him from painting in the conditions present at Mack, but this is insufficient to qualify as a substantial impairment of the major life activity of working under the ADA.

Horvath claims that he has been substantially limited in the major life activities of breathing and working. This court finds that the plaintiff has failed to raise a material issue of disputed fact on whether Horvath's working has been substantially impaired. As stated before, this court finds that plaintiff has raised a material issue of disputed fact whether Horvath's breathing was substantially impaired. Therefore, summary judgment on Horvath's ADA claim is denied with respect to the major life activity of breathing.

### C. Gross Negligence

■ Horvath complains that Mack's failure to provide a fresh air pump for Horvath's term of employment constitutes gross negligence, entitling him to compensatory and punitive damages. However, Horvath's complaint ignores the provisions in Utah's Worker's Compensation Act which compensates workers who are injured as a result of their employment "irrespective of negligence on

the part of employers or employees." *Sheppick v. Albertson's, Inc.*, 922 P.2d 769, 773 (Utah 1996). The Workers' Compensation Act specifically provides a penalty for employers who willfully neglect to keep the place of employment safe, fail to comply with the law, or remove any safety device used to keep the place of employment safe. Utah Code Ann. § 34A–2–301–302. Because Horvath alleges that Mack failed to comply with OSHA standards when it did not provide a fresh air pump, it is the kind of injury that falls squarely within the kinds of injuries the Workers' Compensation Act was intended to protect.

While the Workers' Compensation Act may provide Horvath with compensation for the aggravation of his asthma, it does not allow him to maintain a separate gross negligence cause of action in court against Mack. The Workers' Compensation Act provides that "[t]he right to recover compensation pursuant to this chapter for injuries sustained by an employee ... shall be the exclusive remedy against the employer ... and the liabilities of the employer imposed by this chapter shall be in place of *any and all other civil liability whatsoever....*" Utah Code Ann. § 34A–2–105 (1997) (emphasis added). Utah courts have found that the Workers' Compensation Act allows for only two instances where a plaintiff may avoid preclusion. First, the employee may sue when injured by a willful or intentional tortious act of an employer or fellow employee. *Sheppick*, 922 P.2d at 773–74. Second, the employee may sue if the employer fails to comply with the state employer insurance requirements. *Id.* Horvath has presented no evidence and has made no argument that Mack deliberately intended to injure him, but only argues that the Workers' Compensation Act should not prevent him from recovering under the ADA. Because the claims of gross negligence and violations of the ADA are separate, the Workers' Compensation Act does not in any way prevent Horvath from recovering under the ADA. The Workers' Compensation Act does, however, preclude Horvath from recovering under a gross negligence claim.

Because the Workers' Compensation Act precludes recovery for a gross negligence claim, Horvath's gross negligence claim is dismissed.

## D. Religious Discrimination

Horvath also alleges that Mack discriminated against him based on his religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, and the Utah Anti–Discrimination Act, Utah Code Ann. § 34A–5–106 (1997). Horvath is a member of the Catholic Church and an officer in the Grand Knights of Columbus, an entity affiliated with the Catholic Church. Horvath alleges that Kaylen Ash, a vice president at Mack and a member of the L.D.S. Church, treated Horvath differently than other employees who shared Ash's religious affiliation by denying Horvath overtime, wage increases, and promotions. Horvath also alleges that Ash retaliated against him when Horvath's son, also a Mack employee, filed a religious discrimination charge against Mack. Horvath claims after his son filed this charge, Ash denied him advancements, pay increases, and overtime.

To support a claim of disparate treatment under Title VII, a plaintiff must demonstrate "(1) that [he] was a member of a protected class; (2) that [he] was qualified and performing [his] job satisfactorily; and (3) that [he] was discharged under circumstances that give rise to an inference of discrimination." *Pierson v. Mrs. Fields Cookies*, 857 F.Supp. 867, 871 (D.Utah 1994). If the defendant offers some proof of legitimate non-discriminatory action, the plaintiff must "show by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination." *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1379 (10th Cir.1994). In order to avoid summary judgment, a plaintiff must identify sufficient evidence of pretext for discrimination that would require submission of the case to a jury. *Id. See also, Wiener v. Polaroid Corp.*, 790 F.Supp. 363, 367–368 (D.Mass.1992) ("the non-moving party cannot rest on 'conclusory allegations, improbable inferences and unsupported speculation.' ... Rather, the plaintiff must 'elucidate spe-

cific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: ... discrimination.") (citations omitted).

■ Horvath's claim is deficient under the third criteria because he has not presented sufficient facts to give rise to an inference of discrimination. Additionally, Mack has offered proof of legitimate non-discriminatory action. Horvath alleges that he was subject to religious discrimination, but the actual facts supporting his claim do not support this conclusion. Horvath relies on two facts: 1) Kaylen Ash told Horvath that he paid Mormons ten percent more than other employees because they had to pay ten percent of their income as tithing; 2) A few hours after Horvath participated in an interview with a representative from, the Industrial Commission who was investigating Horvath's son's complaint of religious discrimination, Horvath was relieved of "supervisory" duties. These two allegations provide an inadequate basis for a religious discrimination claim.

With respect to Kaylen Ash's alleged comment regarding paying Mormons a larger salary, Horvath has failed to show anything more than this comment. Mack points out that Kaylen Ash was joking when he made any statement about Mormons being paid more than others and asserts that all wage decisions were made based on management's assessment of the position in question, the company's pay structure and the employees' experience, prior wage history, skills, performance and market factors. Mack offers several affidavits from several employees, Mormons and non-Mormons alike, who declare that all employment decisions were made upon an objective criteria that did not involve religion. Horvath has not offered any evidence suggesting that Mack actually paid members of the Mormon Church a higher salary. Additionally, Mack offers as evidence of its lack of religious discrimination the fact that it donated $300.00 to the Catholic organization that Horvath belonged to when Horvath requested a donation.

■ Mack also refutes the claim that it retaliated against Horvath for participating in the UADD's investigation of Horvath's son's religious discrimination charge. Mack claims they supported Horvath and his interview with the UADD by paying Horvath for the time when he interviewed with the investigator. Furthermore, Mack argues that any relief of supervisory duties Horvath may have felt was a natural result of promoting employee James Farley to the paint department lead. Mack explains that they had offered the lead position to Mr. Farley earlier, but that he had previously refused the position. Also at the time of alleged retaliation, Horvath had told Mack Trucks that he would no longer be able to work in the paint department because of his asthma and was therefore unavailable to work in the lead position. Mack also argues that Horvath's pay was not reduced, his hours were not changed, and he was not denied overtime.

Horvath has failed to meet his burden. He has done nothing more than offer unsupported allegations that he was treated differently than other employees at Mack. Horvath has not offered any affidavits or even names of witnesses who might support his allegations of religious discrimination. Because Horvath has failed to show sufficient facts, this court grants summary judgment in favor of Mack and dismisses Horvath's religious discrimination claim.

■ Horvath also alleges a religious discrimination claim under the Utah Anti–Discrimination Act. For the reasons stated above, this claim is also without a sufficient factual foundation and must be dismissed. Furthermore, to prove a violation of the statute, the Act requires that the aggrieved party file a request for agency action with the Division of Antidiscrimination and Labor. *Id.* § 34A–5–107(1). After the Department of Adjudication has reviewed the charge against the employer and made a decision, then the order may be subject to judicial review. *Id.* § 34A–5–107(12). The statute provides that "[t]he procedures contained in this section are the exclusive remedy under state law for employment discrimination...." *Id.* § 34A–1–07(15). The statute also states that "[t]he commencement of an action under federal law for relief based upon any act prohibited by this chapter bars the commencement or continuation of any adjudi-

cative proceeding before the commission in connection with the same claims under this chapter. Nothing in this subsection is intended to alter, amend, modify, or impair the exclusive remedy provision set forth in Subsection (15)." *Id.* § 34A–1–107(16).

According to the statute, a plaintiff under the Utah Anti–Discrimination Statute must follow the administrative remedies outlined in the statute before a court may review the claim. Because section sixteen of the statute makes clear that a federal suit is not an exception to the exclusive remedies provision of the statute, it is inappropriate for this court to consider plaintiff's Utah Anti–Discrimination Act claim before he has exhausted his administrative remedies under the Act. Accordingly, this court also dismisses plaintiff's Utah Anti–Discrimination Act claim for that reason.

## IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment as to plaintiff's claims under Title VII of the 1964 Civil Rights Act, gross negligence, and Utah Anti–Discrimination Act is hereby GRANTED and plaintiff's claims under these causes of action are hereby DISMISSED with prejudice. Defendant's motion for summary judgment as to plaintiff's claims under the Americans with Disabilities Act is hereby DENIED.