986 P.2d 903

Diane MacLEAN, Plaintiff/Appellant,

v.

STATE of Arizona (DEPARTMENT OF EDUCATION), Defendant/Appellee.

No. 2 CA–CV 99–0102.

Court of Appeals of Arizona,
Division 2, Department A.

July 29, 1999.

As Corrected Aug. 27, 1999.

Guy David Knoller, P.C. By Guy David Knoller, Phoenix, Attorney for Plaintiff/Appellant.

Janet Napolitano, Arizona Attorney General By Lisa K. Hudson, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

PELANDER, Presiding Judge.

¶1 Plaintiff/appellant Diane MacLean worked for the Arizona Department of Education (the Department) from December 1994 to January 1996. After resigning from her job, she sued the state, alleging that she had a "disability" covered by the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101–12213, and that the Department

had violated the ADA by failing to provide her with reasonable accommodation and by retaliating against her for engaging in a protected activity, resulting in a constructive discharge.

¶ 2 The trial court granted the state's motion for summary judgment and later denied MacLean's motion for reconsideration, both rulings without comment or explanation. This appeal followed. We affirm the summary judgment in favor of the state as to that aspect of MacLean's disability claim based on 42 U.S.C. § 12102(2)(C). Finding genuine issues of material fact relating to her other claims, we reverse and remand as to those.

## BACKGROUND

■ ¶ 3 We view all facts and reasonable inferences therefrom in the light most favorable to MacLean. *Bothell v. Two Point Acres, Inc.,* 192 Ariz. 313, 965 P.2d 47 (App. 1998). The following facts are set forth in MacLean's affidavit, filed in response to the state's motion for summary judgment. In her affidavit, MacLean stated, inter alia:

I have been on prescribed medication since 1972 for allergies, asthma, allergic rhinitis, and/or reactive airway disease. For most of my life, I have been unable to swim, walk or hike more than ½ mile, or climb hills, or bikeride [sic] because of my asthmatic condition. I suffer great shortness of breath when attempting any of those activities, even though I am on medication for asthma.... I am unable to carry groceries to my car or from my car to my home. I cannot run. I cannot ride a bicycle. I cannot mountain climb. I cannot snow ski or waterski [sic]. I cannot hike. While trying to swim four laps I collapsed. In my youth, I collapsed trying to run a mile. Recently, when new carpet was laid in my house, I could not breathe. I cannot breathe in a room that has smoke in it. I cannot breath outside on air pollution advisory days. I cannot breathe outside on bad pollen days. I cannot breathe in nursing homes or at hospitals that use deodorizers or have other chemical pollution. I cannot breathe in an office or building that has chemicals from a xerox machine. I cannot work in old buildings which have dust and mold as well as other pollutants. I cannot be in fabric stores because of the lint, dust and other pollutants. I can't be around air fresheners. I am allergic to many plants and foods, as well as having an extreme sensitivity to certain chemicals such as formaldehyde. I cannot walk my dog. I cannot walk in the cold.... I have been diagnosed with having airway disease (asthma), which was responsible for the shortness of breath....

¶ 4 Within a few weeks after she began working at the Department in December 1994, MacLean started experiencing difficulty in breathing and an exacerbation of her asthma. She suspected that the air quality in the Education building was causing those conditions. At a managerial meeting in January 1995, MacLean mentioned that the building's poor air quality was causing her respiratory problems. In March, MacLean experienced chest tightness, an asthma attack, and bronchitis while traveling from Flagstaff to Phoenix. In April, she experienced shortness of breath, headache, burning eyes, nausea, and pain in her lungs, all of which she attributed to her respiratory condition and a major sewer gas exposure in the building.

¶ 5 Later that month, a co-employee, Della Hoffa, received an accommodation for respiratory difficulties by being relocated to a room in a court building across the street. A few days later, MacLean specifically informed Jerry Bowman, her immediate supervisor, about her respiratory problems and the symptoms she had experienced during the sewer gas leak earlier that month. When MacLean requested the same accommodation that Bowman had given Della Hoffa, he told MacLean that calling attention to herself could result in the elimination of her position.

¶ 6 In May 1995, MacLean consulted with her doctor because of her chronic asthma, severe shortness of breath, and pain in her lungs. In late June, she informed Bowman that she had received a letter from her allergist that outlined her problems with the Education building's air quality, and again requested an accommodation. Bowman again

responded that it would be unwise to call attention to herself in that way, and stated, " 'This is a sick building. We all suffer here. What's so special about you?' " In late July, MacLean once again discussed her respiratory problems with Bowman, who took no action.

¶ 7  In mid-October 1995, MacLean provided another Department supervisor with a letter from her doctor dated June 22, 1995, which stated in part:

Diane MacClean [sic] is a patient of mine and has been treated for allergic rhinitis and recently has had some problems with reactive airway disease causing her pulmonary function studies to reveal bronchodilation following a small volume nebulizer treatment where a pulmonary function study was repeated showing good response.

. . . .

She has had a Maxair inhaler which has been used from time to time and, [on] a visit to our clinic in May of 1995, pulmonary function studies did reveal reactive airway disease (asthma) brought on by her work environment. She appears to do very well at home on the weekends, and when she is out travelling visiting various schools in the work place; however, when she returns to her main office, there has been a problem with irritation of her lungs, cough, sore throat, fatigue and respiratory complaints.

. . . .

In view of the fact that the patient is worsened by exposure to that building, it may be in fact, she suffers from the so-called sick building syndrome, in which any number of different chemicals, odors, etc., can trigger patients that have reactive airway disease and [sic] to have significant problems.

Accordingly, I would like to request at this time that the patient be allowed to work in a building across the street where she does not suffer any ill effects and could still perform her same job in the work place.

¶ 8  The Department's Human Resources Manager, Debra Jackson, requested additional information from MacLean, who responded in a memorandum dated October 30, 1995:

The medical diagnosis is in the fourth paragraph of Dr. Hellmers' letter of June 22, "sick building syndrome." If I am housed in a building with a ventillation [sic] system that works properly to take in fresh air, filter it, and circulate it throughout the building, I am symptom free. For example, when I am at Metrotech or the Courts Building for several hours, I am fine. When I have been in this building for several hours, I exhibit the symptoms of an allergic person with asthma—burning eyes, headache, fatigue, coughing, sniffling, sneezing, and wheezing.

. . . .

To date, I have been assigned to three different offices in the building. All three cause the same set of symptoms.

I compensate for the reduced efficiency caused by long stretches of time in the office by working in my home office, outside of regular working hours. I purchased a new computer with Word for Windows 6.0. Since my job performance has been excellent, I don't believe "sick building syndrome" causes limitations in my ability to perform my job tasks. It sure would be nice, though, to be able to get my work done in the office.

¶ 9  According to MacLean's affidavit, within a week after submitting her physician's June 22 letter in mid-October, Bowman "began a reign of terror harassing and humiliating [her]." Bowman's harassment, she stated, continued daily throughout November and December and included his refusing to allow her to telecommute; "chastising [her] for having complained about [her] asthma and the sick building syndrome"; giving her a markedly worse performance evaluation in November compared to one he had prepared on her in May; ordering her into the office on December 5, when she had been sick and confined to home pursuant to doctor's orders, and threatening to fire her; imposing new, unreasonable procedural rules on her; and regularly writing her up for various alleged infractions during December.

¶ 10  On December 5, 1995, MacLean was informed that she would get a temporary

cubicle space in the court building across the street until the Department's administration decided what to do with her. The next day MacLean submitted another memorandum requesting accommodation. On December 11, MacLean filed a charge of discrimination and harassment against the Department with the United States Equal Employment Opportunity Commission (EEOC), based on her claims of retaliation and violations of the ADA. On December 19, MacLean personally delivered to Bowman an employee grievance, the face of which referred to the charge she had filed with the EEOC.

¶ 11 Although MacLean was relocated to the court building, she was not given any furniture, equipment, or books with which to work. In addition, Bowman constantly called her back to the Education building. MacLean tendered her resignation in late December because she was "losing sleep," her "nerves were shot," and she "could take it no longer."

¶ 12 According to MacLean, her lung/respiratory condition has been diagnosed for over twenty years as asthma and has become progressively worse. She has been off work because of her asthma both before and after her job with the Department. In addition, MacLean's respiratory problems have not been limited to the Education building, but rather she has experienced them on other jobs and in other places, including inside and outside of buildings. During her job at the Department, MacLean could not work at one of her assigned locations, the Charter School, because it aggravated her asthma.

¶ 13 In response to the state's motion for summary judgment, MacLean also presented an affidavit from Bruce H. Shelton, M.D., who had been her doctor since December 1995. In his affidavit, Dr. Shelton stated:

Diane MacLean has allergic rhinitis and reactive airway disease dating back to 1972 and continuing through the present time. Her condition limits her life activity of breathing or walking, or working, in multiple settings. Diane MacLean has needed workplace accommodations in various jobs.

It is difficult to determine the full extent of Diane's impairment without medication because she takes medication regularly for her asthma.

Diane is strongly environmentally sensitive to both inhalants and multiple chemicals. She has severely debilitating medical problems.

Because of her medical condition, Diane would not be able to engage in any kind of vigorous, or less vigorous sport or athletic endeavor. She probably would suffer an asthmatic attack (extreme shortness of breath) if she were to engage in a sport or athletic endeavor that involved aerobic activity.

She undoubtedly has had this condition prior to consulting with me in December 1995, and she still has this condition.

¶ 14 Bowman testified in his deposition that he originally had suspected a connection between MacLean obtaining permanent status at the Department in May 1995, and thereafter complaining to him about the building's air quality. He and Jackson also were concerned that MacLean was setting the Department up for a disability claim. During MacLean's employment, Bowman did not believe anything was wrong with her. According to Bowman, Jackson had characterized MacLean as "a whiner, a slacker and a malcontent" after she complained about her health problems.

¶ 15 In September 1996, nine months after MacLean had left the Department, Bowman was surprised to learn through administration that a large number of employees apparently had complained about the building's air quality. Before that time, Bowman had believed that only MacLean and Della Hoffa had made such complaints. A couple of days after obtaining that new information, Bowman sent a memorandum to Jackson, stating in part:

... [The new information about air quality complaints] raised the possibility that Diane MacLean may have received unfair treatment during her employment with the ADE. It raised the possibility that my attitude toward her was clouded by inaccurate air quality information and your own negative comments toward her.

....

... [The new information] leads me to fear that in my dealings with Diane MacLean, I may have allowed your concerns and your interpretations of air quality to overly influence my perceptions of Diane. Clearly, my view of Diane changed from her being a very productive and contributing staff member to one better described as a "whiner", "slacker", "malcontent" and other generally negative perceptions. Can there be any doubt that such a supervisory perception wouldn't have a chilling effect on employee-employer relations and communication? I now believe that there is a good chance that her resignation might have been a direct result of this chilling effect. If so, we are parties to the perpetration of a terrible injustice upon Diane MacLean. My personal assets and liability are shielded by the doctrine of governmental immunity since my involvement was in the "line of duty" and did not contain a hint of "malicious intent." However, if the result manifests itself as an injustice to Diane, it should be corrected by ADE in a timely manner and I'll work toward that end....

¶ 16 Bowman subsequently submitted a revised evaluation, with an increased performance rating, to replace the one he had prepared for MacLean in November 1995. Through that action Bowman was "trying to correct an injustice that had been done." Bowman testified in his deposition that MacLean may have received unfair treatment in two respects: she should have been moved into an alternative office much earlier, and his rapport with MacLean was unfairly affected by the apparently inaccurate information he had had concerning the Education building's air quality. Bowman also testified that, in his view, the "chilling effect" toward MacLean contributed to her leaving the Department.

¶ 17 Bowman was not aware of any reason why MacLean could not have been relocated to the other building sooner. In addition, he acknowledged in his deposition that employee telecommuting was permissible so long as the work got done. Bowman also acknowledged that if in fact MacLean and Hoffa were not the only ones who had complained about the building's air quality, "not providing an accommodation in a forthright manner would probably be constituting an unfair treatment."

## DISCUSSION

■ ¶ 18 MacLean contends the trial court erred in granting summary judgment because genuine issues of material fact exist with respect to both her disability/failure to accommodate claim and her retaliation claim. Conversely, as it did in the trial court, the state asserts that MacLean is not "disabled" within the meaning of the ADA, and that she did not present a triable factual issue on her retaliation claim. On appeal from a summary judgment, we determine de novo whether there are any genuine issues of material fact and whether the trial court erred in applying the law. *Bothell.* We will affirm if the trial court's ruling is correct on any ground and if the facts produced in support of MacLean's claims "have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by [her]." *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990); *Glaze v. Marcus,* 151 Ariz. 538, 729 P.2d 342 (App.1986).

### A.  MacLean Affidavit

¶ 19 Preliminarily, the state urges us to "disregard" MacLean's affidavit because it is "self-serving" and contradicts her previous deposition, in which she testified that she did not remember "having any health problems or symptoms at all" when she began working for the Department in December 1994, and that her symptoms were "no big deal" at that point in time.[1] Thereafter, according to her deposition, she "start[ed] experiencing symptoms" but, as of December 1995, her symptoms were only "related to being in the building" and, after leaving the building on a

---

1.  Although the state also urged the trial court to "largely disregard [MacLean's] conclusory affidavit concerning her condition," the state did not move to strike the affidavit, nor does the record indicate whether the trial court considered it.

Friday afternoon, she would get better by Saturday morning.[2]

¶ 20 "[P]arties cannot thwart the purposes of Rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Wright v. Hills,* 161 Ariz. 583, 588, 780 P.2d 416, 421 (App.1989). Accordingly, "[a] party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Id.* at 587, 780 P.2d at 420. Affidavits may supplement or clarify prior inconsistent deposition testimony "if the affiant was confused at deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth the newly discovered evidence." *Id.* Although those exceptions do not apply here, MacLean's affidavit does not clearly conflict with her deposition testimony. As far as we can tell from the record, MacLean was not specifically asked in her deposition how, if at all, her asthma and related respiratory problems affected her life. Had that inquiry been made, MacLean presumably would have given the detailed explanation of her impairment and its effect that she later furnished in her affidavit.

¶ 21 That MacLean was symptom-free when she first began working at the Department does not necessarily rule out her having had an impairment, albeit controlled, that "substantially limit[ed] one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A). MacLean's awareness of her condition and purposeful avoidance of particular activities and locations that exacerbated it, rather than the absence of any "disability" for ADA purposes, could have explained the lack of symptoms as of December 1994. In short, this is not a case in which the "affidavit contradicts [the affiant's] deposition testimony which clearly states" facts that are diametrically different from those set forth in the affidavit. *Wright,* 161 Ariz. at 588, 780

P.2d at 421. And, unlike the plaintiff in *Patterson v. Chicago Association for Retarded Citizens,* 150 F.3d 719 (7th Cir.1998), on which the state relies, MacLean did not exhibit a "near-total inability to recall even the most basic facts or to provide answers to straightforward, uncomplicated questions during her sworn deposition," *id.* at 724, nor does her affidavit "differ[ ] so drastically from her prior deposition testimony" that it should be ignored. *Id.* at 723. Finally, there is no indication here that MacLean's affidavit is a "sham" designed solely to avoid summary judgment. *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991). Accordingly, we decline the state's invitation to disregard the affidavit.

**B. Disability Claim**

¶ 22 The ADA prohibits certain employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also* § 12111(2). Section 12102(2) of the ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

¶ 23 A discrimination claim under the ADA requires proof that the plaintiff: (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) was discriminated against or terminated by the employer because of the disability. *Cooper v. Neiman Marcus Group,* 125 F.3d 786 (9th Cir.1997). The state does not dispute prong (2) and does not argue prong (3), which encompasses

---

**2.** MacLean contends that the selected portions of her deposition testimony upon which the state relies are "taken totally out of context," and that she also testified that she "had a medical disability at the time [she] started working for the Department" and that her medical records reflected that fact. Although the additional pages from

MacLean's deposition, attached to her reply brief, support her assertions, they are not part of the record on appeal. *See Lewis v. Oliver,* 178 Ariz. 330, 338, 873 P.2d 668, 676 (App.1993) ("We will consider only those matters in the record before us....").

an employer's failure to provide reasonable accommodation for a disability of which it has notice. 42 U.S.C. § 12112(b)(5)(A); EEOC Regulations to Implement The ADA (EEOC Regulations), 29 C.F.R. § 1630.9 (West, WESTLAW through June 15, 1999; 64 FR 32106); *Hendler v. Intelecom USA, Inc.*, 963 F.Supp. 200 (E.D.N.Y.1997). Rather, the state only challenges the first part of the test, contending that MacLean "was not disabled during her employment at Education" because "[h]er condition did not substantially limit any major life activity." MacLean's "sick building syndrome," the state argues, only limited her "in performing her job in the Education building," and any adverse health conditions "she experienced during her employment at Education were limited to the time she spent in [that] building."

¶ 24  According to MacLean, the facts support a finding of disability under subsections (A) and/or (C) o42 U.S.C. § 12102(2). A plaintiff must establish three elements to prove a "disability" under subsection (A): (1) "physical or mental impairment"; (2) "substantially limits"; and (3) "major life activities." *See Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Thompson v. Holy Family Hosp.*, 121 F.3d 537 (9th Cir.1997). The EEOC Regulations, 29 C.F.R. §§ 1630.2(h) through (j), define those elements as follows: a "physical impairment" includes "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: . . . respiratory (including speech organs) . . ."; 29 C.F.R. § 1630.2(h)(1); "substantially limits" means, inter alia, "[u]nable to perform a major life activity that the average person in the general population can perform," or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"; *id.* § 1630.2(j)(*l*)(i) and (ii); and "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i).[3]

¶ 25  The United States Supreme Court recently stated that the phrase "substantially limits" in subsection (A) "requir[es] that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999). Thus, "the substantial limitations [must] actually and presently exist." *Id.* at 2146. In addition, the Court noted that "[t]he ADA does not define 'substantially limits,' but 'substantially' suggests 'considerable' or 'specified to a large degree.'" *Id.* at 2150, *quoting Webster's Third New International Dictionary* 2280 (1976). According to the EEOC Regulations, relevant factors in considering whether an impairment substantially limits a major life activity include: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i) through (iii).

■ ¶ 26  Although portions of the record certainly support the state's contentions, conflicting evidence in the record and reasonable inferences therefrom preclude summary judgment. The state's view of the facts relating to MacLean's disability claim is too narrow. The record as a whole reveals sufficient evidence, including not only her own affidavit but also Dr. Shelton's, to raise a genuine issue of material fact as to whether she had a "disability" within the meaning of 42 U.S.C. § 12102(2)(A) during her employment with the Department. As the Supreme Court noted in Sutton, "whether a person has a disability under the ADA is an individualized inquiry." *Sutton*, 119 S.Ct. at 2147. That inquiry often involves factual questions for the trier of fact. *See, e.g., Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596 (D.Me. 1994).

---

**3.** The United States Supreme Court has not yet determined what deference or persuasive force, if any, should be given to the EEOC interpretive guidelines. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

¶ 27 "Asthma is a physiological disorder that affects the respiratory system, [and] therefore it qualifies as a physical impairment." *Horvath v. Savage Mfg., Inc.,* 18 F.Supp.2d 1296, 1299 (D.Utah 1998) (footnote omitted). The state does not contend otherwise. Contrary to its argument, however, the record does not support summary judgment on the issue of whether MacLean's impairment "substantially limit[ed] one or more of [her] major life activities." 42 U.S.C. § 12102(2)(A). Here, as in Horvath, MacLean "has presented a genuine issue of material disputed fact whether [her] asthma substantially impaired [her] breathing," which obviously is a major life activity.[4] 18 F.Supp.2d at 1302. *See also Hendler* (disputed material facts as to whether plaintiff's asthma substantially limited major life activity of breathing precluded summary judgment); *Geuss v. Pfizer, Inc.,* 971 F.Supp. 164, 170 (E.D.Pa.1996) (sufficient evidence in record to show that plaintiff's "ability to breathe is significantly restricted in condition, manner, and duration in comparison to the average person in the population").

■ ¶ 28 We reach a different conclusion, however, with respect to MacLean's claim that the Department allegedly "regarded [her] as having such an impairment," pursuant to 42 U.S.C. § 12102(2)(C). *See also* 29 C.F.R. § 1630.2(g)(3). As the Court explained in *Sutton:*

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a

substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton,* 119 S.Ct. at 2149–50. *See also Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).

¶ 29 The record is devoid of facts to establish a prima facie claim under either of those two theories. MacLean's counsel conceded as much at oral argument. Contrary to the bald assertion in her brief that "[t]he evidence was overwhelming that [she] was regarded as having a disability (whether or not she actually had one)," the record supports no such finding or inference. Rather, the record reveals that both Bowman and Jackson, at best, were skeptical of MacLean's air quality complaints and health-related claims and certainly did not "regard" her as having a physical impairment that substantially limited any of her major life activities. 42 U.S.C. § 12102(2)(C). That the Department ultimately relocated MacLean to a different building does not alter that conclusion. *See Colwell v. Suffolk County Police Dep't,* 158 F.3d 635 (2d Cir.1998) (providing accommodation does not concede disability); *cf. Capitano v. State,* 178 Ariz. 599, 603, 875 P.2d 832, 836 (App.1993) (that employer found employee "categorically unfit for a particular job" does not necessarily establish that employer "regarded" employee as having impairment under Federal Rehabilitation Act, 29 U.S.C. § 706(8)(B) (now § 705(20)(B))). Accordingly, the trial court properly granted summary judgment in favor of the state on the subsection (C) claim.

## C. Retaliation Claim

■ ¶ 30 The ADA prohibits retaliation against employees who exercise their rights under the ADA. 42 U.S.C. § 12203(a).[5] A

---

4. The record, however, does not present a genuine issue of material fact as to whether Mac-Lean's impairment substantially limited her ability to work. *See Thompson; Horvath.* In addition, as her counsel conceded at oral argument, any limitation in MacLean's ability to walk is solely attributable to her respiratory problems. Therefore, the trial court did not err

in granting summary judgment as to those two, separate aspects of her disability claim.

5. Specifically, the statute prohibits discrimination against an individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated

prima facie case of retaliation under the ADA requires proof that (1) plaintiff engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the two. *Barnett v. U.S. Air, Inc.*, 157 F.3d 744 (9th Cir.1998); *Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir.1997). The state contends MacLean's "retaliation claim fails on all three elements." Analysis of ADA retaliation claims parallels the analytical framework employed for retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a). *Krouse*; *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir.1997). Although the evidence by no means clearly establishes retaliation here, we find it sufficient to defeat summary judgment.

¶ 31 Contrary to the state's argument, MacLean's repeated requests for accommodation, supported by her doctor's June 22, 1995 letter that she mentioned to Bowman in June and submitted to the Department in October, constituted protected activity. *See, e.g., Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (deaf plaintiff's requests for telecommunications device "were protected communications"); *Soileau*, 105 F.3d at 16 (although plaintiff "did not literally oppose any act or practice, but simply requested an accommodation, which was given[,] [i]t would seem anomalous ... to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge"); *Barker v. International Paper Co.*, 993 F.Supp. 10, 16 (D.Me.1998) ("requesting an accommodation for a disability constitutes a protected activity under the ADA"); *Garza v. Abbott Lab.*, 940 F.Supp. 1227, 1244 (N.D.Ill.1996) (plaintiff who "engaged in statutorily protected expression by requesting accommodation for her disability" and thereafter denied access to reassignment through internal placement system "made out a prima facie ... retaliation ... claim").

¶ 32 The state also contends that MacLean "did not suffer any actionable adverse employment action during her employment at Education" and that, even if she did, she failed to establish a causal relationship. To the extent MacLean's retaliation claim is based on alleged constructive discharge resulting from her health-related complaints and requests for accommodation, we disagree with the state's position.[6] MacLean's counsel conceded at oral argument, and we agree, that the Department's treatment of MacLean would not constitute adverse employment action unless, as she claims, it ultimately resulted in her constructive discharge. Viewed as a whole, however, the evidence relating to how Bowman treated MacLean from mid-October until her resignation in late December presents a triable issue of fact on the adverse action and causation elements.

¶ 33 MacLean's affidavit sets forth the various forms of harassment and discriminatory treatment that Bowman subjected her to during her last two months at the Department. Bowman gave MacLean a poorer performance evaluation in November than he had in May, and later altered it because he felt he had treated her unfairly. More importantly, according to MacLean, Bowman "chastis[ed] [her] for having complained about [her] asthma and the sick building syndrome"; prohibited her from telecommuting, even though other employees could; ordered her to the Education building on a day that she had stayed home on doctor's orders due to her asthma, and then threatened to fire her; kept MacLean in the building the entire following day despite her complaint that her lungs hurt; imposed unreasonable new procedural rules on MacLean that did not apply to other employees; and generally harassed her on a daily basis during November and December. When the Department finally relocated MacLean to another building, an action Bowman later acknowledged should have occurred much sooner, he failed to equip her new space with standard office furnishings and constantly called her back to

---

in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). *See also* EEOC Regulations, 29 C.F.R. § 1630.12.

6. Because the record does not reflect a genuine issue of material fact as to whether MacLean suffered any adverse action causally-related to her filing of a charge with EEOC, the state was entitled to summary judgment as to that claim.

the Education building. Those factual assertions in MacLean's affidavit are not merely "sweeping generalizations and conclusions," entitled to no weight, as the state contends.

¶ 34 Moreover, in his deposition, Bowman confirmed many of MacLean's allegations. He had "no question in [his] mind" that if the Department "wants to get rid of an employee, get an employee to quit, that they can do that or they can employ means to attempt to do that." Although Bowman was not "ready to concede a hundred percent that that is the case" with MacLean, he "believe[d] that there [was] some percentage of the change in atmosphere that caused Diane to leave." Bowman also acknowledged that his attitude toward and treatment of MacLean in late 1995 produced a "chilling effect on their working relationship." Bowman expressed similar beliefs in his memorandum to Jackson in September 1996, concluding that "there is a good chance that [MacLean's] resignation might have been a direct result of this chilling effect," which had worked a "terrible injustice" on her.

¶ 35 As the state correctly notes, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996). An employment action is adverse only if it causes a material change in the terms or conditions of employment. *See Ledergerber v. Stangler*, 122 F.3d 1142 (8th Cir.1997); *Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir.1996). Thus, a performance evaluation that is not substandard or used as a basis for any action against the employee does not constitute adverse action. *See Montandon v. Farmland Ind., Inc.*, 116 F.3d 355 (8th Cir.1997); *Rabinovitz*; *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890 (10th Cir. 1994). Moreover, a claim of constructive discharge requires proof that the plaintiff's "working conditions were so intolerable that a reasonable person would have been compelled to resign." *Rabinovitz*, 89 F.3d at 489. *See also Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir.1998); *West v. Salt River Agric. Improvement & Power Dist.*, 179 Ariz. 619, 880 P.2d 1165 (App. 1994); *Civil Rights Div. of Arizona Dep't of*

*Law v. Vernick Plumbing & Heating Co.*, 132 Ariz. 84, 643 P.2d 1054 (App.1982).

¶ 36 Notwithstanding those requirements, MacLean presented sufficient evidence to support a prima facie claim that her protected conduct resulted in adverse employment action against her. It is for the trier of fact to evaluate all the evidence and to determine whether the circumstances under which MacLean resigned amounted to a constructive discharge and, hence, an adverse employment action. "As for the causation element, the temporal sequence between the protected expression and the adverse action may indicate a causal link between the two," thereby precluding summary judgment on that ground. *Garza*, 940 F.Supp. at 1244. *See also Wyatt v. City of Boston*, 35 F.3d 13 (1st Cir.1994); *Barker*; *Rabinovitz*. Similarly, to the extent the record reflects arguably "legitimate, non-retaliatory reason[s] for [any] adverse employment action" by the Department against MacLean, *Krouse*, 126 F.3d at 500, the record also presents genuine issues of material fact as to whether such reasons are pretextual and whether "retaliation was the real reason for the adverse employment action." *Id.* at 501.

¶ 37 Finally, we are unpersuaded by the state's arguments that MacLean's retaliation claim fails as a matter of law because she "did not resign her employment with the State [but] merely transferred to a new [state] agency," and because she attempted to return to her position with the Department, a job that she had "loved," a few months after her resignation. The state cites no authority to support these propositions, which, at most, may affect the weight a trier may give to MacLean's factual assertions or may bear on her damage claims.

## DISPOSITION

¶ 38 We affirm the trial court's summary judgment as to that aspect of MacLean's disability claim based on 42 U.S.C. § 12102(2)(C). We reverse and remand for further proceedings with respect to MacLean's other claims.

CONCURRING: WILLIAM E. DRUKE, Judge, and M. JAN FLÓREZ, Judge.