Rosemary PATTERSON,
Plaintiff–Appellant,

v.

CHICAGO ASSOCIATION FOR RETARD-
ED CITIZENS, an Illinois Not–for–Prof-
it Corporation, Defendant–Appellee.

No. 97–2595.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1998.

Decided July 22, 1998.

Gerald A. Goldman, Arthur R. Ehrlich (argued), Chicago, IL, for Plaintiff–Appellant.

Lawrence I. Kipperman (argued), Sidley & Austin, Chicago, IL, for Defendant–Appellee.

Before BAUER, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant, Rosemary Patterson ("Patterson"), a teacher at a special education school operated by the defendant-appellee, Chicago Association for Retarded Citizens ("CARC"), was dismissed from her job on May 18, 1995, for exhibiting "inappropriate behavior." Patterson filed suit in district court, alleging she was wrongfully terminated under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12117. The defendant filed a motion for summary judgment, and the district court, on June 5, 1997, granted the defendant's motion, ruling that Patterson was not "disabled" within the meaning of the ADA. The court, in granting the motion, refused to consider an affidavit submitted by Patterson in which she attempted to demonstrate that a question of material fact existed as to whether she was, in fact, "disabled," within the meaning of the ADA. The court's refusal was based on this Court's reasoning in the case of *Unterreiner v. Volkswagen of America Inc.*, 8 F.3d 1206 (7th Cir.1993). In *Unterreiner*, we held that an affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable. *See id.* at 1210. The trial court found the affidavit to be "self-serving" and lacking in factual support from the record. The plaintiff appeals the trial court's granting of the summary judgment motion. We affirm.

## BACKGROUND

CARC is a not-for-profit corporation that operates schools, vocational workshops, and other programs for mentally disabled adults and children in Chicago, Illinois. CARC is responsible for the operation of six special education schools that provide intensive teaching and therapy to severely mentally disabled children. The children attending these schools are referred to CARC by the Chicago Board of Education in situations after the public school system has determined that it is unable to provide adequate services for these youngsters.

CARC requires that its teachers possess at least a bachelor's degree in teaching and a teaching certificate from the State of Illinois. As part of their job description, teachers employed by CARC must: (1) ensure the well-being of their students; (2) formulate individual lesson plans for each student; (3) engage in daily activities with students; (4) attend to the personal care and needs of the students; and (5) manage the behavior of the students. Furthermore, each teacher is required to work closely with parents, therapists, and school social workers to ensure each child develops to his or her fullest potential.

In 1974, long before she was hired by CARC, Patterson was diagnosed as suffering from paranoia [1] and was prescribed an anti-psychotic medication known as Stelazine, as well as a number of other drugs including Prozac. Patterson was initially hired as a teacher by CARC in 1982, and between the date of hiring and 1993, on two separate occasions, she was hospitalized for paranoia.[2] During the time Patterson was employed at CARC's Evelyn C. Nelson School from 1993 until 1995, she was assigned to teach a small class of seven severely retarded children, ages 7 through 12, and was aided by a teacher's assistant named Mary Brown ("Brown"). Most of the children in Patterson's class were not toilet trained and four of the seven children could not speak. Because of the severe degree of retardation exhibited by most of these children, Patterson and other teachers employed at the Nelson School were taught and expected to be extremely vigilant in monitoring the well-being of the students. Specifically, teachers had to execute proper procedures to control students who were "acting out" to ensure that students endangered neither themselves nor the other children. Teachers had to be able to recognize signs of a seizure or other medical emergencies and take immediate action; a teacher's vigilance in monitoring students was critical because many of CARC's severely retarded students could not speak and would have had difficulty communicating in an emergency.

In the spring of 1994, Patterson was observed to be neglecting her duties as a teacher in that she would often sit at her desk, away from the children, "staring into space." On a few occasions, Patterson told Brown that she had stopped taking her paranoia medication. Patterson became disinterested in her class and often led class exercises in a monotone voice or left the classroom to go to the bathroom while she was supposed to be attending to her students, in violation of school regulations. Patterson frequently asked School Director Evelyn Nelson ("Nelson") [3] for permission to go for short walks around the schoolyard in the middle of the day, and on one occasion, Patterson asked to leave early because she believed everyone was watching her and she was "not safe" at school. Brown also reported incidents in which Patterson appeared to her to be suffering from delusions. On one such occasion, Patterson stated that she saw writing on a boy's pants when in fact there were only flowers. Later, when three faces were drawn on the chalkboard, one happy, one sad, and one neutral, Patterson told Brown that all three faces were sad.

In April of 1994, Patterson was absent from work for several days due to illness.

---

1. Paranoia is defined as "behavior characterized by well-systematized delusions of persecution, delusions of grandeur, or a combination of the two." Dorland's Illustrated Medical Dictionary 1230 (28th ed.1994).

2. The record does not reflect whether CARC was aware of Patterson's paranoia at the time she was hired in 1982.

3. Note that the school where Patterson worked, the Evelyn C. Nelson School, was named after School Director Nelson.

On April 15, 1994, Nelson contacted Patterson at home to inform her that she would need to obtain a "clearance" from a doctor before she would be permitted to return to work. In spite of this order, Patterson returned three days later, on April 18, without a doctor's clearance. Patterson was advised by the school's social worker that she needed the doctor's release before she could return to work. The following morning, however, Patterson telephoned Nelson and told her that she would not obtain a doctor's release, and asked Nelson to put the clearance request in writing. Patterson called ten minutes later and repeated her sentiments.

Patterson then sent a letter to Douglas Brandow ("Brandow"), CARC's Director of Children's Services, asking to see CARC's policy regarding doctor's releases and informing him that she considered herself "suspended." Brandow responded to Patterson's letter on April 21, 1994, explaining that she was not "suspended" and that CARC was "interested only in [Patterson's] ability to carry out [her] job which requires close contact with young, severely handicapped children." Brandow also enclosed a letter for Patterson to take to her physician, as well as a copy of the relevant portions of the school's collective bargaining agreement. Thereafter, Patterson produced a letter from her physician, Dr. Andre Dunigan ("Dunigan"), and returned to work on April 28, 1994. Dunigan's letter explained that Patterson needed no special accommodation, but that in order for her to "do her job properly she should stay in compliance with [her] medications."

Nelson, concerned with personal observations and reports of Patterson's behavior, requested that CARC's consulting psychologist, Paul Kredow ("Kredow"), observe Patterson's classroom behavior. In May of 1994, shortly after the original psychotic episode, Kredow observed Patterson for a day. Kredow noted that Patterson was depressed, distracted, failed to interact with her students, and for part of the morning, sat apart from the class staring into space. Kredow recommended that Patterson be given a medical leave of absence to address her mental health problems. Nelson allowed her to keep working, however, based on Dunigan's positive report.

Although Patterson's performance improved in the second half of 1994, she once again commenced exhibiting unusual behavior in early 1995. Nelson began receiving reports that Patterson was making sexual advances towards male CARC employees and that she was calling employees at late hours of the night. Brown and Nelson also observed Patterson once again sitting alone at her desk, not interacting with the children or participating in class instructional activities.

Furthermore, according to the records of her treating physician, Dr. Ahluwalia, Patterson was again becoming paranoid. Patterson told Dr. Ahluwalia that she had seen visions of the number 38 and had thought that someone was going to shoot her with a .38 caliber gun. Patterson also told Dr. Ahluwalia that she had begun hallucinating at home. Dr. Ahluwalia recommended to Patterson that she be hospitalized for treatment, but Patterson refused. By the end of March of 1995, Patterson agreed to follow Dr. Ahluwalia's recommendation and take a leave of absence, as she was depressed and once again displayed the onset of another attack of paranoia in stating that someone was tampering with her medication.

After a three-week absence from her job, Patterson claimed she felt better and returned to work, and was reassigned at this time to a class of older children with less severe problems. Two weeks after returning, Patterson once more began to exhibit strange behavior as a result of her discontinuing her medication. Patterson became morose and withdrawn, and during a May 10, 1995, appointment with Dr. Ahluwalia, Patterson reported feeling suspicious. Later, Patterson called Dr. Ahluwalia and insisted that he was conspiring against her and that he was trying to "poison" her. Beginning on May 15, 1995, Patterson called Nelson at home each day to tell her she was sick. On May 18, 1995, Nelson, the school nurse, and two other CARC employees, called Dr. Ahluwalia to check on Patterson. Dr. Ahluwalia responded that Patterson was undergoing an active psychotic episode, that she had "fired"

him as a doctor, and that she had called him twenty times in the past week, accusing him of trying to poison her. Nelson immediately informed Brandow of Patterson's behavior, and Brandow decided to terminate Patterson on the spot. Since her termination, Patterson has been employed by the Chicago Board of Education as a substitute teacher. The children she teaches now are neither retarded nor disabled.

Patterson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was wrongfully terminated by CARC under the ADA. Patterson's charge was dismissed on May 31, 1996. In dismissing the charge, the EEOC found no cause to conclude that CARC had violated the ADA in terminating Patterson. Patterson then filed a complaint under the ADA in federal district court on July 30, 1996. CARC filed a summary judgment motion on March 31, 1997, shortly after the close of discovery, and the district court issued a memorandum opinion granting CARC's motion on June 5, 1997. In granting the motion, the court refused to consider "self-serving denials" in an affidavit filed by Patterson on the ground that the affidavit differed from her deposition testimony and lacked factual support in the record. The trial judge found that Patterson had failed to offer evidence to demonstrate that she was in fact disabled within the meaning of the ADA.

## ISSUES

On appeal, Patterson contends that the trial court abused its discretion when granting CARC's motion for summary judgment by refusing to consider the "self-serving denials" in her affidavit. The trial court refused to consider the affidavit because it differed so drastically from her prior deposition testimony. Further, the plaintiff argues that the district court erred in granting the defendant's summary judgment motion on the ground that Patterson failed to offer evidence establishing that she either had a "disability" within the meaning of the ADA, or was a "qualified individual with a disability" within the meaning of the ADA.

## DISCUSSION

■■■ The trial court's decision to disregard the plaintiff's affidavit is an evidentiary matter that is reviewed under the abuse of discretion standard. *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir.1996). In *Buckner*, this Court ruled that the district judge did not abuse his discretion in excluding the plaintiff's post-deposition affidavit which was filed in opposition to the defendant's summary judgment motion. *See id.* In such circumstances, the trial judge generally is to be afforded "much deference." *Id.* This Court reviews the trial court's grant of summary judgment de novo. *See Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 148 (7th Cir.1994). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, demonstrate that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The standard of review for summary judgment in employment discrimination cases is no different: "employment discrimination cases are not governed by a separate set of rules ... they remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997) (citations omitted).

### A. The Plaintiff's Affidavit

■■ The plaintiff attached to her response to the defendant's motion for summary judgment a detailed affidavit concerning her unusual statements and behavior during her employment at CARC. In sharp contrast to her deposition testimony, where the plaintiff answered 255 questions, "I don't know, sir," the affidavit was clear and detailed and responded to specific points contained in the defendant's summary judgment motion. In addition, the plaintiff's affidavit contradicted parts of her deposition, as well as the depositions of all of the other witnesses interviewed prior to trial. The plaintiff contends that the affidavit did not amount to a contradiction of her previous curt denials or memory lapses. The district court, in granting the defen-

dant's motion for summary judgment, refused to rely on Patterson's "selfserving" affidavit.

 It is well established in this Circuit that "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993) (citation omitted). "[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion." *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir.1991). When a party has been deposed and later files an affidavit which differs from the prior deposition testimony, "[i]f the later statement is sufficiently unlikely—to the point of unreliable—then it cannot be used to create a 'genuine issue of material fact.'" *Unterreiner*, 8 F.3d at 1210. Thus, a party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior testimony. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995).

In *Buckner*, a case with facts virtually identical to those of the case under consideration, the plaintiff denied knowledge of certain facts relevant to causation during her deposition, but later provided much greater detail in an affidavit attached to her response to the defendant's summary judgment motion. *See* 75 F.3d at 292. This Court held that the district court had not abused its discretion in excluding the affidavit, noting that the contradiction appeared not in comparing facts to facts, but in contrasting the plaintiff's lack of knowledge during her deposition with the detailed explanation in her affidavit. *See id.* at 293. We held that "[t]he concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission." *Id.*

CARC's efforts to obtain Patterson's version of events in discovery were hampered by Patterson's near-total inability to recall even the most basic facts or to provide answers to straightforward, uncomplicated questions during her sworn deposition, similar to the situation in *Buckner*. The defendant has noted 255 instances during Patterson's deposition that she responded that she could not recall or did not know the answer to proffered questions. Patterson's affidavit, on the contrary, was specifically worded and included detail vastly more precise than her deposition testimony. The affidavit consisted mostly of simple denials that incidents addressed in the defendant's motion for summary judgment had occurred. However, no independent evidence could be found in the record that would support her claims. Under this Court's rule in *Unterreiner*, "self-serving" denials are not considered evidence for the purpose of establishing that a genuine issue of material fact exists, and thus, the trial judge did not abuse his discretion in refusing to consider the affidavit the plaintiff submitted with her response to the defendant's motion for summary judgment.

## B. The Plaintiff's Claim that She is "Disabled" Under the ADA

 The plaintiff contends that the trial court "erred when it held that Plaintiff was not disabled." Particularly, the plaintiff notes that she

> was unable to function at all or care for herself when the medications were not able to control her condition. Clearly, if an individual's mental condition causes her to be psychotic, interferes with her ability to perceive reality and causes her to have hallucinations, then that condition is substantially interfering with her ability to care for herself and to function.

The trial court ruled that Patterson's claim was invalid because she had not adduced evidence sufficient to demonstrate that she was "disabled" within the meaning of the ADA.

The ADA specifically provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). This Court has previously held that in order to establish a claim of discrimination under the ADA, the plaintiff must demonstrate: "(1) that she is disabled within the meaning of the ADA, (2) that her work performance met her employer's legitimate expectations, (3) that she was discharged, and (4) that the circumstances surrounding her ... discharge indicate that it is more likely than not that her disability was the reason for these adverse actions." *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 794 (7th Cir.1997) (citation omitted).

Under the statute, "disability," with respect to an individual, is defined as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). EEOC regulations interpret the ADA to define the phrase "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Being "substantially limited" in the major life activity of working requires that a person be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). This Court has held that "an inability to perform a particular job for a particular employer" is not sufficient to establish a substantial limitation on the ability to work; rather, "the impairment must substantially limit employment generally." *Byrne v. Board Of Educ., Sch. of West Allis–West Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992). In *Roth v. Lutheran Gen. Hosp.*, we held that the plaintiff-surgeon failed to demonstrate that the trial court abused its discretion in ruling that the plaintiff had fallen short of establishing some likelihood of success on the merits to prevail on a motion for preliminary injunction under the ADA. 57

F.3d 1446, 1454 (7th Cir.1995). To succeed on his claim under the ADA, the plaintiff, who suffered from visual impairments, needed to demonstrate that he was disabled. *See id.* We held that although the plaintiff was impaired, his argument that he would be unable to work long shifts due to the condition of his eyes did not "rise[ ] to the level" of disability required under the ADA. *Id.*

> Drawing an analogy to employment cases where the inability to perform either a particular job for a particular employer or a narrow range of jobs is held not to be a disability, we cannot say that an inability to fulfill long shifts or 36 hour call duties ... necessarily proves that [the plaintiff] is disabled within the meaning of the [ADA].

*Id.* at 1454–55 (footnote and citation omitted).

In the case under consideration, Patterson indisputably suffers from a mental illness. The regulations promulgated pursuant to the ADA include mental illness as an example of an "impairment" for ADA purposes. *See* 29 C.F.R. § 1630.2(h)(2). As previously mentioned, Patterson, having been diagnosed with paranoia in 1974, received both inpatient and out-patient treatment on a number of occasions. However, in order for Patterson to demonstrate that she is suffering from a "disability" within the meaning of the ADA, she must establish that she has a "physical or mental impairment that substantially limits one or more of the major life activities...." 42 U.S.C. § 12102(2). As discussed earlier, "major life activities" include the activity of working, and in this case, Patterson's specific type of work is teaching. *See* 29 C.F.R. § 1630(i). However, to be "substantially limited" for the purpose of working, an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes...." 29 C.F.R. § 1630.2(j)(3)(i). Thus, Patterson's impairment must render her incapable of performing any teaching job, not just a specific sort of teaching job. Her impairment "must substantially limit employment generally." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir.1996) (citation and internal quotation omitted). The evidence in the record demonstrated only that Patterson was

significantly restricted in the ability to perform one specific area of classroom instruction: that is, she was found to be incapable of instructing and vigilantly monitoring a group of severely retarded children, most of whom have additional psychiatric or emotional problems or physical impairments. Patterson cannot argue that she is substantially restricted in her ability to work as a teacher, under 29 C.F.R. § 1630.2(j)(3)(i), because the undisputed evidence establishes that immediately upon her termination by CARC and ever since, Patterson was and has continued to be regularly employed as a teacher within the Chicago Public School system. In all probability, Patterson's failure to follow her prescription and regularly ingest her medication interfered with her teaching skills and caused her condition to deteriorate to such a degree that she was unable to perform her duties as an instructor of severely retarded children. Since her termination from CARC as a teacher of severely retarded children, Patterson has been steadily employed in the Chicago Public School system, and judging from the record, her ability to perform the duties of a teacher in the system generally has not been affected.

 The inquiry of determining whether a person has met the threshold burden of establishing that he or she is "disabled" within the meaning of the ADA is an individualized one. *See Roth,* 57 F.3d at 1454. As such, the determination must be made "on a case-by-case basis." *Id.* (citations omitted). In this case, Patterson has failed to present sufficient evidence to convince either the trial court or this Court that her termination from CARC was improper or that her paranoia substantially interferes with her ability to work within her general field of employment, teaching. We are convinced that the trial court did not err in concluding that Patterson was not disabled. The trial court's decision to grant the defendant's motion for summary judgment was proper.

*C. The Plaintiff's Claim that She Was a "Qualified Individual" Under the ADA*

The plaintiff next contends that she was qualified to perform her duties and teach and

was therefore deemed a "qualified individual" within the meaning of the ADA. However, because we have already determined that the plaintiff was not "disabled" within the meaning of the ADA, the plaintiff's ADA claim fails, and we need not consider the merits of this final issue.

## CONCLUSION

The trial court did not abuse its discretion in refusing to consider the "self-serving denials" contained in Patterson's affidavit. Furthermore, the plaintiff failed to establish that she had a "disability" within the meaning of the ADA.

AFFIRMED.