Corrine WALKER, Plaintiff,

v.

DOCTORS HOSPITAL OF HYDE PARK, Defendant.

No. 98 C 2291.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 21, 2000.

Corinne Walker, Chicago, IL, pro se.

Michael T. Trucco, Stamos & Trucco, Chicago, IL, Elisha S. Rosenblum, Cahill, Christian & Kunkle, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Ms. Walker sued Defendant, claiming that Defendant terminated her in violation of 42 U.S.C. § 1981, and in retaliation for exercising her rights under the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq.* (West 1996). In addition, Ms. Walker alleges that Defendant negligently retained a racist employee and failed to notify her of her right to continued healthcare coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 *et seq.* (West 1996). For the reasons set forth below, the Court grants Defendant's Motion.

## FACTS

Plaintiff Corrine Walker, an African-American female, interviewed for a human resources position at Doctors Hospital of Hyde Park ("Doctors Hospital") in June, 1996. (Defendant's 56.1(a) Statement of Material Facts [Def.'s 56.1(a)] ¶ 4.) On June 14, 1996, Ms. Betty Honeysucker, the head of Doctors Hospital's Human Resources Department, hired Ms. Walker for the newly-created position of health educator. (Def.'s 56.1(a) ¶¶ 5–6.) At the time Ms. Walker was hired, the staff in the Human Resources Department was predominantly African American, with only two Caucasian employees: Mr. Douglas Passett, a human resources consultant with whom Ms. Walker was expected to work, and Ms. Phyllis Daniels, a benefits specialist. (Def.'s 56.1(a) ¶ 29.)

Ms. Walker began working for Doctors Hospital on Monday, June 17, 1996. (Def.'s 56.1(a) ¶ 7.) During her first week of work, Ms. Walker participated in a basic orientation program conducted by various personnel, including Mr. Passett. (*Id.*) On Friday, June 21, 1996, Ms. Walker and Mr. Passett had a conversation during which only the two of them were present. (Def.'s 56.1(a) ¶ 8, Pl.'s Dep. at 96.) Ms. Walker alleges that Mr. Passett used racially derogatory language when speaking with her.[1] (Pl.'s Dep. at 159, 398.)

Ms. Walker claims that she informed Ms. Honeysucker of Mr. Passett's racist comments and that Ms. Honeysucker assured her that Ms. Walker would have all the support she would need. (*Id.* at 135.) Ms. Walker further claims that Ms. Honeysucker told her that she knew "exactly what's going on" and that Ms. Walker did not "have to fear." (*Id.* at 135, 141.) At her deposition, however, Ms. Honeysucker denied receiving complaints from Ms. Walker or any other employee that Mr. Passett was racist or had made racist remarks. (Defendant's Reply to Plaintiff's 56.1(b)(3)(A) Statement of Additional Facts [Def.'s Reply to Pl.'s 56.1(b)(3)(A)] ¶ 3.)

When Ms. Walker returned to work on Monday, June 24th, Mr. Passett was out of the office. (Pl.'s Dep. at 141; Def.'s 56.1(a) ¶ 11.) Ms. Honeysucker directed Ms. Walker to gather education files in Mr. Passett's office and xerox them in preparation for an orientation the following week.[2] (Pl.'s Dep. at 141, 390.) Ms. Walker claims that Ms. Honeysucker further directed her to work at Mr. Passett's desk for the day. (*Id.* at 390.)

### Ms. Walker Is Injured At Work

The next day, June 25, 1996, Mr. Passett returned to work and told Ms. Walker he wanted to speak with her. (Pl.'s Dep. at 392–93.) Mr. Passett was upset because someone had gone through his files. (Pl.'s Dep. at 392–93, 398; Def.'s 56.1(a) ¶ 13.) Ms. Walker claims that Mr. Passett was screaming that his files were missing and

disorganized and that Ms. Walker should not have been in his office.[3] (Pl.'s Dep. at 398.) Ms. Walker stated that, between his swearing and cursing, Mr. Passett made racial comments and then demanded that she leave his office. (*Id.* at 398–400) At that point, Mr. Passett allegedly grabbed the office door and slammed it on Ms. Walker's foot as she was walking out. (*Id.*)

After the incident, Ms. Walker alleges that she went directly to Ms. Honeysucker's office and reported that Mr. Passett "just went ballistic" and "slammed the door against" her. (Pl.'s Dep. at 407–08.) Pursuant to office policy, Ms. Honeysucker directed Ms. Walker to go to the emergency room. (Def.'s 56.1(a) ¶ 19.)

Ms. Walker walked to Doctors Hospital's Emergency Room without assistance, and reported that she was experiencing pain in her right foot and ankle. (Def.'s 56.1(a) ¶ 19; Pl.'s Dep. at 168.) Ms. Walker was advised that none of the bones in her foot or ankle were broken, but that she had an acute contusion of the right foot. (Def.'s 56.1(a) ¶ 19; Pl.'s Dep. at 170; Daniels Dep., Ex. 3.) The Emergency Room discharged Ms. Walker and informed her that she could return to work in two days, on June 27, 1996. (Def.'s 56.1(a) ¶ 19.) However, Ms. Walker never returned to her job at Doctors Hospital.

### Ms. Walker's Medical Treatment And Documentation

Doctors Hospital immediately advised its workers compensation carrier, Wausau

---

1. Ms. Walker claims that Mr. Passett said that "you people don't belong here and you don't do things right." (Plaintiff's 56.1(b)(3)(B) Statement of Additional Facts [Pl.'s 56.1(b)(3)(B)] ¶ 1.) She further states that Mr. Passett used profanity and said that "blacks were ... not qualified to be there, illiterate, could not work...." (*Id.*) Additionally, Ms. Walker claims that Mr. Passett said "he hated us, and he didn't feel that we were functional there." (*Id.*)

2. At her deposition, however, Ms. Honeysucker stated that she counselled Ms. Walker "several times about not going through [Mr. Pas-

sett's] desk and [Ms. Walker] ignored [her] counsel." (Honeysucker Dep. at 22.) It is unclear when Ms. Honeysucker would have had the opportunity to do so, however, as Ms. Walker worked at Doctors Hospital for only one full business day following her orientation.

3. Mr. Passett denies making racial statements during this conversation or at any time during his employment. (Def.'s 56.1(a) ¶ 15; Passett Dep. at 55.) Moreover, the parties dispute whether Mr. Passett was expected to share his office with Ms. Walker.

Insurance ("Wausau"), that Ms. Walker had been injured at work. (Def.'s 56.1(a) ¶ 20.) On June 26, 1996, Ms. Janelle Kopecky, a Wausau representative, telephoned Ms. Walker regarding her injury. (Def.'s 56.1(a) ¶ 20.) Ms. Walker explained to Ms. Kopecky that the incident had not been an accident. (Pl.'s Dep. at 288.) Ms. Kopecky promised to follow-up with Ms. Walker regarding her injury.

On July 8, 1996, Ms. Walker visited Dr. William Gee, at the Southshore Hospital Family Medical Center, for her complaints of right foot pain, headaches, and nausea. (Pl.'s Dep., Ex. 11.) Dr. Gee noted that Ms. Walker complained of being "very nervous" since the alleged incident. (*Id.*) He made a particular notation of Ms. Walker's blood pressure (150/93), but stated that her "anxiety was resolving." (*Id.*) Dr. Gee ordered a reevaluation in two weeks. (*Id.*) The record does not reveal when or whether Dr. Gee communicated this information to Doctors Hospital or Wausau.

On July 9, 1996, Ms. Walker consulted Dr. Herbert Wright, a chiropractor and podiatrist, regarding her injury. Dr. Wright's injury report diagnosed Ms. Walker with a right foot contusion, a right ankle contusion, a right leg contusion, and a lumbosacral strain/sprain. (Daniels Dep., Ex. 6.) Once again, the record does not reveal when or whether Dr. Wright forwarded this information to Doctors Hospital or Wausau.

On July 9, 1996, Ms. Kopecky sent to Ms. Walker a "Statement of Facts" form, and requested that Ms. Walker return the completed form to Wausau. (Honeysucker Dep., Ex. 4.) Ms. Kopecky sent Ms. Walker yet another letter that day regarding the delay in the processing of her claim, explaining that Wausau had not yet received a doctor's report confirming Ms. Walker's injury. (Honeysucker Dep., Ex. 6.)

On July 11, 1996, Ms. Kopecky sent a letter to Dr. Wright requesting information about Ms. Walker. (Daniels Dep., Ex. 7.) On July 12, 1996, Dr. Wright noted that

Ms. Walker would be unable to return to work for the next two weeks. (Daniels Dep., Ex. 7.) The record does not disclose when or whether Dr. Wright forwarded this information to Doctors Hospital or Wausau.

On July 18, 1996, Ms. Walker completed Wausau's "Statement of Facts" form and returned it to Ms. Kopecky. (Honeysucker Dep., Ex. 4.) On the form, Ms. Walker claimed that she had continuing medical problems with her foot as a result of the injury. (*Id.*) She said she experienced ankle weakness, severe pain, leg and body spasms, elevated blood pressure, anxiousness, sleeplessness and continued swelling. (*Id.*)

On July 23, 1996, Dr. Gee saw Ms. Walker again and noted that her blood pressure was high; the following day Dr. Gee noted that her blood pressure was lowered. (Pl.'s Dep., Ex. 11) Dr. Gee also noted that, although Ms. Walker was still anxious, her anxiety was subsiding. (*Id.*) The only diagnosis ever put forth by Dr. Gee was that of "anxiety."

On August 1, 1996, Ms. Walker again visited Dr. Wright. Dr. Wright noted that Ms. Walker continued to complain of chronic pain and would require an additional week off of work until she could be reevaluated on August 8, 1996 (Daniels Dep., Ex. 8.) There is no evidence in the record that Ms. Walker saw Dr. Wright again until August 19, 1996, or that Dr. Wright informed Doctors Hospital or Wausau of her status. On August 19, 1996, Dr. Wright stated that Ms. Walker could return to work on August 26, 1996. (Ms. Honeysucker Dep., Ex. 9.) By this time, however, Doctors Hospital had already terminated Ms. Walker.

### *Ms. Walker's Termination*

On August 16, 1996, Ms. Honeysucker notified Ms. Walker via certified mail that she was being terminated. Ms. Honeysucker explained that Doctors Hospital was terminating Ms. Walker because she

failed to provide Doctors Hospital with a treatment statement or an expected date of return to work. (Def.'s 56.1(a) ¶ 23; Honeysucker Dep., Ex. 10.) The certified mail receipt indicates that Ms. Walker received the termination letter on August 19, 1996. (Honeysucker Dep., Ex. 12.)

Both Ms. Honeysucker and Ms. Daniels claim that, prior to Ms. Walker's termination, they did not receive the appropriate documentation from Ms. Walker regarding her injuries or medical records from her treating doctor. (Def.'s 56.1(a) ¶¶ 21–22.) Moreover, Ms. Honeysuckle testified that Wausau made repeated attempts to contact Ms. Walker regarding her treatment and return to work, but that Ms. Walker failed to respond. (Honeysucker Dep. at 63.)

However, Ms. Honeysucker admits that she communicated with Ms. Walker about her return to work at least one time after Ms. Walker's injury and before her termination. Also, Ms. Honeysucker concedes that she was somehow notified that Ms. Walker would be returning to work in early to mid-August, as Ms. Honeysucker testified that she terminated Ms. Walker approximately five to seven days after she anticipated Ms. Walker would return to work. (Honeysucker Dep. at 65.)

### Procedural History

Ms. Walker filed an Application for Adjustment of Claim with the State of Illinois Industrial Commission for Worker's Compensation on May 28, 1997. On the application, she claimed her right foot, leg, ankle, and head were injured.

Ms. Walker then filed a Complaint against Doctors Hospital in federal district court. Count I of Ms. Walker's Amended Complaint alleges that Doctors Hospital terminated her in violation of 42 U.S.C. § 1981 ("§ 1981"). Count II realleges the § 1981 violation and seeks punitive damages. Count III charges that Doctors Hospital terminated Ms. Walker in retaliation for filing a worker's compensation claim, and seeks compensatory damages.

Ms. Walker repeats and realleges the same facts under Count IV, seeking punitive damages. In Count V, Ms. Walker alleges negligent retention of a racist employee under Illinois law. Finally, in Count VI, Ms. Walker claims that Doctors Hospital did not advise her of her rights to continue her health care coverage, in violation of her rights under COBRA and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 et seq.

Since the filing of her Amended Complaint, Ms. Walker has elected to proceed *pro se*. On November 8, 1999, Doctors Hospital filed this Motion for Summary Judgment.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact, and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In reviewing a motion for summary judgment, the Court must view the record and draw all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of demonstrating that no evidence exists to support the non-moving party's contentions. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The non-moving party may not rest on her pleadings, but must affirmatively demonstrate, by specific allegations, that a genuine issue of material fact exists which requires a jury trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (the non-movant must do more than simply "show that there is some metaphysical doubt as to the material facts.")

These standards are further explicated by Local Rule 56.1(b)(3)(a), which provides that the party opposing a motion for sum-

mary judgment shall file a concise response to each numbered paragraph in the moving party's 56.1(a) statement, and in the case of any disagreement, must support its responses with specific citations to the record. If the non-moving party does not cite to the record for each disputed fact, such facts will be deemed admitted. *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1313 (7th Cir.1995).

In Ms. Walker's 56.1(b)(3)(a) Response to Defendant's 56.1(a) Statement of Uncontested Facts, she did not appropriately dispute most of Doctors Hospitals' factual averments. "[T]hose who fail to strictly adhere to the mandates of Rule 12 [now Rule 56.1] must be prepared to face the harsh consequences of noncompliance because the Court will not comb the record in search of factual statements where no citation to the parties' Rule 12 [Rule 56.1] statements has been provided." *Martinez v. Labelmaster, American Labelmark Co.,* No. 96 C 4198, 1998 WL 786391, at*1 (N.D.Ill. Nov. 6, 1998).

Notwithstanding these harsh consequences, the Court has gone to great lengths to assess Ms. Walker's case on its substantive merits, because Ms. Walker is currently a *pro se* plaintiff. *See Hudson v. McHugh,* 148 F.3d 859, 864 (7th Cir.1998) (holding that in the case of a *pro se* plaintiff, the court should construe the allegations in the plaintiff's pleadings and the record liberally). Notwithstanding the leniency afforded *pro se* plaintiffs, the Court will not alter its standard when evaluating the substantive merits of the case. *Philipper v. Dorn,* No. 98 C 7722, 1999 WL 558123, at *6 (N.D.Ill. July 26, 1999).

## ANALYSIS

Defendant seeks summary judgment on all six counts in Ms. Walker's Amended Complaint. In her Response to Doctors Hospital's Motion for Summary Judgment, Ms. Walker defends only her § 1981 claim in Counts I and II of her Amended Com-

plaint. *See Collier v. Baker,* No. 96 C 0023, 1999 WL 543206, at*9 (N.D.Ill. July 23, 1999) (plaintiffs' failure to argue counts raised in their complaint results in waiver). However, this Court will substantively address all of Ms. Walker's claims to demonstrate the propriety of entering summary judgment against the entire Amended Complaint.

## I. Violation of § 1981, Compensatory Damages

■ In Count I of her Amended Complaint, Ms. Walker alleges that Doctors Hospital terminated her for complaining about Mr. Passett's racist remarks in violation of § 1981. Section 1981 protects employees from unlawful discrimination in contractual relationships. *Allen v. Dominick's Finer Foods, Inc.,* No. 98 C 3320, 1999 WL 1102692, at *1 (N.D.Ill. Nov. 24, 1999).

Ms. Walker can establish a § 1981 violation by two different methods. First, she may provide a sufficient amount of direct evidence to demonstrate unlawful racial discrimination. Should her direct evidence not suffice, Ms. Walker may prove her case by meeting all of the elements under the indirect burden-shifting method of proof announced by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 511 (7th Cir.1986) (holding that the *McDonnell Douglas* burden-shifting scheme is applicable to discrimination suits under § 1981). The Court finds that Ms. Walker fails to prove discrimination under either method.

## A. Direct Evidence of Racial Discrimination

■ Direct evidence is evidence which proves the fact in question without asking the trier of fact to infer or presume additional facts. *Allen,* 1999 WL 1102692, at *2.[4] The evidence "need not only speak

---

4. The Court notes that the majority of Seventh Circuit opinions in Title VII cases have ruled

directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Oates v. Discovery Zone*, 116 F.3d 1161, 1170 (7th Cir.1997) (citations omitted). Once the plaintiff presents this evidence, "the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account." *Id.*

 When the plaintiff offers discriminatory remarks as direct evidence of discrimination, the plaintiff generally must show that the statements were made by the decision-maker responsible for the adverse job action. *Robinson v. Chicago Transit Auth.*, No. 97 C 4041, 1999 WL 409888, at *4 (N.D. Ill. June 7, 1999). Stray remarks by nondecision-makers, if unrelated to an employment decision, are insufficient to demonstrate that the employer relied on discriminatory criteria in making its decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

For example, in *Allen*, the plaintiff attempted to prove that his employer fired him due to racial slurs aimed at him by various subordinate employees. *Allen*, 1999 WL 1102692, at *2. The plaintiff relied exclusively upon his own deposition testimony as direct evidence that his co-workers made such remarks. *Id.* The *Allen* Court held that "statements made by non-decision-makers are not probative of the decision-maker's intent." *Id.* (citing *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 301 (7th Cir.1996)). The court explained that summary judgment was warranted because the plaintiff failed to introduce evidence linking the derogatory remarks to the employer's termination decision. *Allen*, 1999 WL 1102692, at *2.

 Like the plaintiff in *Allen*, Ms. Walker's direct evidence of discrimination consists only of her own uncorroborated deposition testimony that Mr. Passett made racially derogatory remarks in her presence on two occasions. The Court notes that "occasional and sporadic uses of racial slurs or epitaphs will not in and of themselves support an actionable claim of racial harassment." *Fortenberry v. United Airlines*, 28 F.Supp.2d 492, 496 (N.D.Ill.1998) (quotations omitted). In addition, even assuming that Mr. Passett made such remarks, as we must, Mr. Passett was not involved in the decision to terminate Ms. Walker. Ms. Walker presents absolutely no evidence that Mr. Passett's stray remarks influenced Ms. Honeysucker's decision to terminate her. Absent evidence of a nexus between Mr. Passett's remarks and Ms. Walker's termination, Ms. Walker has failed to present direct evidence of discrimination.

### B. Indirect Evidence of Racial Discrimination Using the Burden–Shifting Method

Ms. Walker can still establish discrimination under the *McDonnell Douglas* indirect, burden-shifting approach. *Oates*, 116 F.3d at 1171. To succeed under this approach, Ms. Walker must establish a prima facie case of racial discrimination to "create[ ] a presumption that the employer unlawfully discriminated against [her]." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Doctors Hospital presents a legitimate, non-discriminatory reason for Ms. Walker's termination, the presumption dissolves and Ms. Walker

that direct evidence may not rely on inference or presumption. *See, e.g., Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). At the same time, however, the court has reaffirmed that the definition of direct evidence incorporates some elements of the indirect burden-shifting method of proof. *See Council 31, American Federation of State,* *County, Mun. Employees, AFL–CIO v. Doherty*, 169 F.3d 1068, 1072 (7th Cir.1999); *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997) (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)). This Court, therefore, finds that *Troupe* remains good law, and will consider circumstantial evidence under the direct evidence test.

must then demonstrate that the proffered reason for her termination is a pretext for discrimination. *See Oates,* 116 F.3d at 1171. Ms. Walker can demonstrate pretext by "showing that a discriminatory reason more likely than not motivated the [employment decision], or . . . that the employer's proffered explanation is unworthy of credence." *Kralman v. Illinois Dep't of Veterans' Affairs,* 23 F.3d 150, 156 (7th Cir.1994).

In order to establish her prima facie case, Ms. Walker must show that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) Doctors Hospital treated similarly-situated employees outside of her protected class more favorably. *Id.* Doctors Hospital disputes Ms. Walker's ability to meet the fourth, "similarly situated" prong of her prima facie case.

█ To satisfy the fourth prong of her prima facie case, Ms. Walker must offer evidence that Doctors Hospital would have taken a different course of action if Ms. Walker had been of a different race and all other factors remained the same. *Oates,* 116 F.3d at 1171 (citing *Carson v. Bethlehem Steel,* 82 F.3d 157, 158 (7th Cir.1996)). Ms. Walker has presented no evidence that Doctors Hospital has or would have treated a similarly-situated employee outside of her protected class more favorably. Therefore, she cannot establish a prima facie case of race discrimination.

█ Moreover, Doctors Hospital has offered a legitimate, nondiscriminatory reason for terminating Ms. Walker's employment. *Greenslade v. Chicago Sun–Times, Inc.,* 112 F.3d 853, 864 (7th Cir.1997) (the employer's reason "need only be facially nondiscriminatory.") Doctors Hospital contends that it terminated Ms. Walker for failing to provide it with relevant medical records justifying her extended leave from work.

Ms. Walker attempts to demonstrate pretext by relying upon her own deposition testimony that she and her doctors forwarded the relevant information and medical documents to Ms. Honeysucker and Wausau. *See Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 723–24 (7th Cir.1998) (conclusory statements and self-serving affidavits, without support in the record, will not defeat a motion for summary judgment). The only other evidence in the record even remotely supporting Ms. Walker's contention that she and her physicians supplied Wausau and Ms. Honeysucker with the requested information comes from Doctors Hospital.

At her deposition, Ms. Honeysucker conceded that she was somehow notified that Ms. Walker would be returning to work in early to mid-August; Ms. Honeysucker testified that she terminated Ms. Walker approximately five to seven days after she anticipated Ms. Walker would return to work. In addition, in response to a subpoena issued by Ms. Walker's former counsel, both Wausau and Doctors Hospital produced copies of Dr. Wright's response to Wausau's July 11, 1996 request for information and August 1, 1996 treatment notes. Doctors Hospital offers uncontested evidence, however, that Ms. Walker forwarded a copy of Dr. Wright's response to Doctors Hospital on August 20, 1996—four days after Doctors Hospital terminated her. (Daniels Dep., Ex. 14).

Drawing all reasonable inferences in Ms. Walker's favor, the record does support an inference that Ms. Walker communicated at least minimally with Doctors Hospital prior to her termination, because Ms. Honeysucker anticipated that Ms. Walker would return to work sometime between approximately August 7 and August 11, 1996. Nevertheless, as of August 16, 1996, Ms. Walker still had not returned to work, and there is absolutely no evidence that she or her physicians communicated with Doctors Hospital again before August 20, 1996. Although Ms. Walker may believe that Doctors Hospital's termination decision was not warranted, the issue is not whether the decision was correct, but

whether it was discriminatory. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 396 (7th Cir.1998) (courts should "not sit as a super-personnel department that reexamines an entity's business decisions.")

Ms. Walker, therefore, offers no evidence that she was terminated, more likely than not, for a discriminatory reason or that Doctors Hospital's proffered reason for terminating her is not worthy of credence. This Court finds that Ms. Walker fails to show that Defendant's stated reasons for firing her were pretextual.

In sum, even if Ms. Walker had been able to establish a prima facie case of discrimination, she would still fail to show that Doctors Hospital's proffered reason for terminating her was pretextual. Therefore, Doctors Hospital is entitled to summary judgment on Count I.

Moreover, because Ms. Walker is unable to establish that Defendant violated § 1981, she cannot recover the punitive damages she seeks in Count II. Therefore, the Court also grants Doctors Hospital motion for summary judgment on Count II of the Amended Complaint.

## II. *Retaliatory Discharge Under State Law*

 Count III alleges that Defendant terminated Ms. Walker in retaliation for her filing a worker's compensation claim under the IWCA. To show retaliatory discharge, Ms. Walker must set forth sufficient facts from which it can be inferred that: (1) she was an employee of Doctors Hospital prior to her injury; (2) she exercised her rights under the IWCA;

and (3) her discharge was causally related to the filing of a claim under that Act.[5] *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir.1994) (citing *Gonzalez v. Prestress Eng'g Corp.*, 194 Ill.App.3d 819, 822, 141 Ill.Dec. 606, 551 N.E.2d 793 (1990)). "Under Illinois law, the element of causation is not satisfied if the employer has a valid, nonpretextual basis for discharging the employee." *Crout v. Barber–Colman Co.*, No. 93 C 20122, 1996 WL 304530, at *7 (N.D.Ill. May 30, 1996).

The parties dispute Ms. Walker's ability to establish causation. It is unclear from the record when Ms. Walker first filed her worker's compensation claim. The evidence most damaging to Ms. Walker's case, however, comes from Ms. Walker herself. At her deposition, Ms. Walker testified that she first asserted her rights under the IWCA after Doctors Hospital terminated her employment. (Pl.'s Dep. at 282.) Nevertheless, on August 7, 1996, an attorney purportedly representing Ms. Walker faxed to Ms. Kopecky at Wausau a completed Application for Adjustment of Claim seeking worker's compensation benefits. This attorney indicated to Ms. Kopecky that the Application had been filed on Ms. Walker's behalf on approximately July 30, 1996, prior to Ms. Walker's termination. (Pl's Dep. Ex. 10.)[6]

 Ordinarily, determining when a plaintiff first filed an IWCA claim is significant because "[u]nder Illinois law, a short period of time between the filing of a workers' compensation claim and the discharge can present a prima facie case of

---

5. Federal courts, employing their own procedural rules, are free to analyze Illinois retaliatory discharge cases under the burden shifting method set forth in *McDonnell Douglas. Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 767 (7th Cir.1994). Regardless of the analysis employed, Ms. Walker's claim fails because she has not introduced sufficient evidence to challenge Doctors Hospital's legitimate reason for terminating her.

6. As discussed in the factual section of this opinion, the record also contains a second

Application for Adjustment of Claim filed with the Illinois Industrial Commission on May 28, 1997. This filing provides even less support for Ms. Walker's IWCA allegations, given the extensive lapse of time between Ms. Walker's termination and the filing of this second claim. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994) (affirming judgment for the employer where the plaintiff did not file his IWCA claim until long after he was terminated).

retaliatory discharge." *Crout,* 1996 WL 304530, at *8. In the instant case, however, Ms. Walker is unable to establish a violation of the IWCA because she cannot demonstrate that Doctors Hospital's legitimate reason for terminating her is pretextual. *See generally, McEwen v. Delta Air Lines, Inc.,* No. 87 C 10434, 1990 WL 6867, at *3 (N.D.Ill. Jan. 4, 1990) (timing evidence alone is insufficient to raise an inference of pretext).

Doctors Hospital has offered evidence that it terminated Ms. Walker when she failed to return to work or provide Doctors Hospital with sufficient documentation regarding her injury. As discussed above, Ms. Walker has presented no evidence casting doubt upon Doctors Hospital's legitimate reasons for terminating her. Because Ms. Walker has failed to raise a genuine issue of material fact as to whether Doctors Hospital terminated her in retaliation for filing a workers' compensation claim, Doctors Hospital's summary judgment motion as to Count III is granted.

Ms. Walker's inability to establish a violation of the IWCA prevents her from recovering the punitive damages she seeks in Count IV. Therefore, given the Court's disposition on Ms. Walker's IWCA claim, the Court finds that Doctors Hospital is entitled to summary judgment on Count IV as well.

### III. *Negligent Retention*

Count V alleges that Doctors Hospital was negligent in retaining Mr. Passett because it knew or should have known of his racist and violent tendencies. Doctors Hospital, however, argues that Ms. Walker is barred by the IWCA from seeking a recovery in tort against her employer. The Court agrees.

■ The IWCA's exclusivity provision bars employees from pursuing common

law claims and statutory actions against employers for accidental injuries sustained during the course of employment. 820 ILCS 305/5(a) (West 2000). The IWCA abrogates employer liability for all common law negligence claims, including negligent retention claims. *Simmons v. Chicago Public Library,* 860 F.Supp. 490, 494 (N.D.Ill.1994).

■ There are four exceptions to the IWCA's exclusivity provision: (1) the injury was not accidental; (2) the injury did not arise from her employment; (3) the injury was not received during the course of her employment; or (4) the injury was not compensable under the Act. See *Meerbrey v. Marshall Field & Co.,* 139 Ill.2d 455, 463, 151 Ill.Dec. 560, 564 N.E.2d 1222 (1990). The only exception that could possibly apply to Ms. Walker's allegations is the first exception; that her injury was intentional and not accidental.[7] *Quiroz v. Ganna Const.,* No. 97 C 480, 1998 WL 386344, at *3 (N.D.Ill. July 8, 1998) (employees suffering assaults by coworkers in the workplace and during workhours cannot rely upon exclusivity exceptions 2, 3, or 4).

■ In the case of a coworker's assault, the resulting injury is not accidental if the plaintiff can show that the employer or an alter-ego of the employer intentionally inflicted, commanded, or expressly authorized the tortious act committed by the coworker. *Quiroz,* 1998 WL 386344, at *3 (citing *Meerbrey,* 139 Ill.2d at 463, 151 Ill.Dec. 560, 564 N.E.2d 1222). Therefore, if the employer, or its alter ego, acts with a specific intent to injure the employee through the acts of the employee's coworkers, the injury that results no longer remains an accident. *Naszke v. Federal Express Corp.,* No. 94 C 6084, 1996 WL 450832, at *6 (N.D.Ill. Aug. 6, 1996).

---

**7.** Courts have noted that the IWCA bars all negligence claims, and that the exclusivity exceptions apply, if at all, to intentional torts only. *See, e.g., Porter v. International Bus. Machines Corp.* 21 F.Supp.2d 829, 833

(N.D.Ill.1998). Even if the exceptions did apply to negligence claims, Ms. Walker has failed to establish that any of the exceptions apply to her claim.

[15] Ms. Walker has not alleged that Doctors Hospital was directly involved in the assault either through intentional infliction of the assault or by commanding or authorizing the assault. Ms. Walker argues only that Ms. Honeysucker knew of Mr. Passett's racist tendencies. However, there is absolutely no evidence on the record that Doctors Hospital or Ms. Honeysucker had in any way authorized, directed, encouraged, or commanded Mr. Passett's alleged behavior. *Fortenberry v. United Air Lines*, No. 96 C 3198, 1997 WL 457499 (N.D.Ill.1997) (a plaintiff's showing that the employer knew or should have known of a coworker's harassment is insufficient to show intentional infliction, commanding or express authorization under the IWCA).

Nor has Ms. Walker demonstrated that Mr. Passett was Doctors Hospital's alter ego. As a general rule, a low-level supervisory employee is not the employer's alter ego. *Crissman v. Healthco Int'l Inc.*, No. 89 C 8298, 1992 WL 223820, at *6 (N.D.Ill. Sept. 02, 1992) ("When a tortfeasor is merely a foreman, supervisor or manager, attributing responsibility to the employer defeats one of the purposes of the [IWCA]—shielding the innocent employer from unexpected liability.") Ms. Walker has neither alleged nor produced any evidence from which this Court could infer that Mr. Passett "in a practical sense [spoke] for the company" or possessed "the authority to make decisions and set policy on behalf" of Doctors Hospital. *Id.* at *9.

Because Ms. Walker is unable to demonstrate that Doctors Hospital acted intentionally or that Mr. Passett was Doctors Hospital's alter ego, she cannot establish that any of the exceptions to the IWCA's exclusivity provision apply. Therefore, the Court finds that the IWCA's exclusivity provision preempts Ms. Walker's negligent retention claim and that summary judgment on Count V is warranted.

## IV. COBRA Violation

Count VI of Ms. Walker's Amended Complaint alleges that Doctors Hospital did not advise Ms. Walker of her continued health care coverage as required by Section 162(k) of the Internal Revenue Code, thus violating Ms. Walker's rights under COBRA. Doctors Hospital responds that it could not have violated COBRA because Ms. Walker was not entitled to such notification. Specifically, Doctors Hospital asserts that, because Ms. Walker failed to work a minimum of 30 hours per week over a 30 day period, she was not eligible for health coverage under its plan and was not entitled to COBRA notification. The Court agrees.

■ COBRA requires an employer to notify any "qualified beneficiary" of her right to continued healthcare coverage in the event of termination. 29 U.S.C. § 1161 (West 2000). COBRA includes "covered employees" within its definition of a "qualified beneficiary" entitled to such notification in the event of termination. 29 U.S.C. § 1163 (West 2000). However, an employee who is never covered under the employer's healthcare plan is not a "covered employee" under COBRA, and, therefore, is not entitled to such notification. *See Presley v. Blue Cross–Blue Shield,* 744 F.Supp. 1051, 1058–59 (N.D.Ala.1990).

■ Ms. Walker has not challenged Doctors Hospital's evidence that she was not a covered employee under COBRA, because she was never covered by its healthcare plan. Moreover, the Court finds that Doctors Hospital's requirement that an employee work 30 hours per week over a 30 day period prior to being eligible for coverage under its healthcare plan is a reasonable requirement and well within the boundaries proscribed by law. *See* 26 I.R.C. § 410(a)(1)(A)(ii) (authorizing an employer to require its employees to complete a period of no more than a year of service in order to activate its health benefits plan).

Because Ms. Walker was never entitled to receive health insurance benefits from Doctors Hospital, she was never entitled to the COBRA notification she asserts she never received. Therefore, Doctors Hospital is entitled to judgment in its favor on Count VI of the Amended Complaint.

## CONCLUSION

Ms. Walker has not raised a genuine issue as to any material fact on Counts I through VI. Doctors Hospital is, therefore, entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that: Defendant's Motion for Summary Judgment be, and the same hereby is, **GRANTED**.

**IT IS FURTHER ORDERED** that: Plaintiff's Amended Complaint be, and the same hereby is, dismissed with prejudice.